Electronically Filed
Supreme Court
SCAP-18-0000432
23-AUG-2019
09:05 AM

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

CLARENCE CHING and MARY MAXINE KAHAULELIO,
Plaintiffs-Appellees,

vs.

SUZANNE CASE, in her official capacity as Chairperson
of the Board of Land and Natural Resources and
State Historic Preservation Officer, BOARD OF LAND AND NATURAL
RESOURCES, and DEPARTMENT OF LAND AND NATURAL RESOURCES,
Defendants-Appellants.

SCAP-18-0000432

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CAAP-18-0000432; CIV. NO. 14-1-1085-04)

AUGUST 23, 2019

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY POLLACK, J.

## I. INTRODUCTION

Under the Hawai'i Constitution, all public natural resources are held in trust by the State for the common benefit of Hawai'i's people and the generations to come. Additionally,

the constitution specifies that the public lands ceded to the United States following the overthrow of the Hawaiian Monarchy and returned to Hawaiʻi upon its admission to the Union hold a special status under our law. These lands are held by the State in trust for the benefit of Native Hawaiians and the general public. Accordingly, our constitution places upon the State duties with respect to these trusts much like those of a common law trustee, including an obligation to protect and preserve the resources however they are utilized.

Several parcels of ceded land on the island of Hawaiʻi that are indisputably held in public trust by the State have been leased to the federal government of the United States of America for military training purposes, subject to a number of lease conditions designed to protect the land from long-term damage or contamination. This case concerns the degree to which the State must monitor the leased trust land and the United States' compliance with the lease terms to ensure the trust property is ultimately safeguarded for the benefit of Hawaiʻi's people.

We hold that an essential component of the State's duty to protect and preserve trust land is an obligation to reasonably monitor a third party's use of the property, and that this duty exists independent of whether the third party has in fact violated the terms of any agreement governing its use of

the land.  To hold otherwise would permit the State to ignore the risk of impending damage to the land, leaving trust beneficiaries powerless to prevent irreparable harm before it occurs.  We therefore affirm the trial court's determination that the State breached its constitutional trust duties by failing to reasonably monitor or inspect the trust land at issue.

## II.  BACKGROUND

### A. Lease No. S-3849

On August 17, 1964, the State of Hawaiʻi Department of Land and Natural Resources (DLNR) entered into a written agreement to lease three tracts of ceded land situated at Kaʻohe, Hāmākua and Puʻuanahulu, North Kona, Hawaiʻi to the United States for military purposes.[1]  The 22,900 acre tract of land, which is contained within the Pōhakuloa Training Area (PTA),[2] was leased to the United States for a term of sixty-five years, to expire

---

[1]     Hawaii's ceded lands are lands which were classified as government or crown lands prior to the overthrow of the Hawaiian monarchy in 1893.  Upon annexation in 1898, the Republic of Hawaii ceded these lands to the United States.  In 1959, when Hawaii was admitted into the Union, the ceded lands were transferred to the newly created state, subject to the trust provisions set forth in § 5(f) of the Admission Act.

Pele Def. Fund v. Paty, 73 Haw. 578, 585, 837 P.2d 1247, 1254 (1992).

[2]     The PTA as a whole is approximately 134,000 acres and includes land ceded to the United States military by Presidential and Governor's Executive Orders, land purchased by the United States in fee simple from a private owner, and land that is leased from the State.

on August 16, 2029. In exchange, the United States paid the DLNR one dollar.

The lease gives the United States the right to "have unrestricted control and use of the demised premises." The lease also establishes several duties that the United States is obligated to fulfill during the course of the lease. Most notably for purposes of this appeal, Paragraph 9 of the lease requires that the United States "make every reasonable effort to . . . remove and deactivate all live or blank ammunition upon completion of a training exercise or prior to entry by the [] public, whichever is sooner."[3] In Paragraph 14 of the lease, the United States agrees to "take reasonable action during its use of the premises herein demised to prevent unnecessary damage to or destruction of vegetation, wildlife and forest cover, geological features and related natural resources" and to "avoid pollution or contamination of all ground and surface waters and remove or bury all trash, garbage and other waste materials

---

[3]    Paragraph 9 of the lease states the following:

In recognition of public use of the demised premises, the Government shall make every reasonable effort to stockpile supplies and equipment in an orderly fashion and away from established road and trails and to remove or deactivate all live or blank ammunition upon completion of a training exercise or prior to entry by the said public, whichever is sooner.

resulting from [the United States'] use of the said premises."[4]

And, in Paragraph 29 of the lease, the United States agrees that, if required by the State upon the surrender of the property at the termination of the lease, it will "remove weapons and shells used in connection with its training activities to the extent that a technical and economic capability exists and provided that expenditures for removal of shells will not exceed the fair market value of the land."[5]

---

[4] Paragraph 14 provides the following:

In recognition of the limited amount of land available for public use, of the importance of forest reserves and watersheds in Hawaii, and of the necessity for preventing or controlling erosion, the Government hereby agrees that, commensurate with training activities, it will take reasonable action during its use of the premises herein demised to prevent unnecessary damage to or destruction of vegetation, wildlife and forest cover, geological features and related natural resources and improvements constructed by the Lessor, help preserve the natural beauty of the premises, avoid pollution or contamination of all ground and surface waters and remove or bury all trash, garbage and other waste materials resulting from Government use of the said premises.

[5] Paragraph 29 provides the following:

The Government shall surrender possession of the premises upon the expiration or sooner termination of this lease and, if required by the Lessor, shall within sixty (60) days thereafter, or within such additional time as may be mutually agreed upon, remove its signs and other structures; provided that in lieu of removal of structures the Government abandon them in place. The Government shall also remove weapons and shells used in connection with its training activities to the extent that a technical and economic capability exists and provided that expenditures for removal of shells will not exceed the fair market value of the land.

The lease also places a number of corresponding rights and duties on the DLNR. The most relevant to the present case is established in Paragraph 18, in which the DLNR agrees to "take reasonable action during the use of the said premises by the general public, to remove or bury trash, garbage and other waste materials resulting from use of the said premises by the general public."[6] In Paragraph 19, the lease also grants the DLNR the "right to enter upon the demised premises at all reasonable times to conduct any operations that will not unduly interfere with activities of the [United States] under the terms of the lease," subject to "obtaining advance clearance" from the United States.[7]

Additionally, the lease provides in Paragraph 30 that any dispute over a question of fact regarding the lease must be

---

[6] Paragraph 18 provides the following:

> The Lessor hereby agrees that, commensurate with the public use of the premises herein demised, it will take reasonable action during the use of said premises by the general public, to remove or bury trash, garbage and other waste materials resulting from use of the said premises by the general public.

[7] Paragraph 19 provides the following:

> Subject to obtaining advance clearance from the plans and training office of the Government's controlling agency, or any other designated Government agency, officials and employees of the Lessor shall have the right to enter upon the demised premises at all reasonable times to conduct any operations that will not unduly interfere with activities of the Government under the terms of this lease; provided however, that such advance clearance shall not be unreasonably held.

decided by the "Division Engineer, U.S. Army Engineer Division," with a right of appeal to the Secretary of the Army.[8]  Paragraph 30 further provides that the decision of the Secretary or a duly authorized representative "shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence."  The paragraph clarifies that questions

_____

[8]     Paragraph 30 provides the following:

(a) That, except as otherwise provided in this lease, any dispute concerning a question of fact arising under this lease which is not disposed of by agreement shall be decided by the Division Engineer, U.S. Army Engineer Division, Pacific Ocean, Honolulu, Hawaii, hereinafter referred to as said officer, who shall within a reasonable time reduce his decision and the reasons therefor to writing and mail or otherwise furnish a copy thereof to the Lessor.  The decision of the said officer shall be final and conclusive unless, within thirty (30) days from the date of receipt of such copy, the Lessor mails or otherwise furnishes to the said officer a written appeal addressed to the Secretary of the Army.  The decision of the Secretary or his duly authorized representative for the determination of such appeals shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence.  In connection with any appeal proceeding under this condition, the Lessor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal.

(b) This Condition does not preclude consideration of law questions in connection with decisions provided for in paragraph (a) above: Provided, that nothing in this Condition shall be construed as making final the decision of any administrative official, representative, or board on a question of law.

(c) That all appeals under this provision shall be processed expeditiously.

of law may also be considered in connection with a dispute's resolution, but the decision of any administrative party on a question of law shall not be final.  It further guarantees the State's right to be heard and to offer evidence in support of the appeal.

## B. The Plaintiffs' Request to Access Government Records

In January 2014, Clarence Ching filed a request with the Chairperson of the Board of Land and Natural Resources (BLNR) to access government records.  Ching requested the following government records:

> 1. Paragraph 9 of State General Lease No. S-3849 (with the U.S. Army relating to Pohakuloa) requires the United States Government to "make every reasonable effort to . . . remove or deactivate all live or blank ammunition upon completion of a training exercise or prior to entry by the said public, whichever is sooner."  Please provide all government records that show (a) the U.S. Government's compliance or non-compliance with this lease term and (b) the Department of Land and Natural Resources or Board of Land and Natural Resources efforts at ensuring compliance with this term of the 1964 lease.  This would include, but [is] not limited to, correspondence, inspection and monitoring reports, and meeting notes.
>
> 2. Paragraph 14 of the same lease requires the U.S. Government to "remove or bury all trash, garbage or other waste materials."  Please provide all government records that show (a) the U.S. Government's compliance or non-compliance with this lease term and (b) the Department of Land and Natural Resources or Board of Land and Natural Resources efforts at ensuring compliance with this term of the 1964 lease.  This would include, but [is] not limited to, correspondence, inspection and monitoring reports, and meeting notes.

The DLNR responded that the request would be granted in its entirety.  The response stated that the DLNR was providing its

entire file on the lease (the lease file), which, based on its review, contained no records responsive to Ching's request.

## C. The Circuit Court Action

### 1. Complaint

Three months later, Ching and Mary Maxine Kahaulelio (collectively, "the Plaintiffs") filed a complaint in the Circuit Court of the First Circuit (circuit court) against the BLNR, DLNR, and William J. Aila, Jr., in his official capacity as Chairperson of the BLNR and State Historic Preservation Officer (collectively, "the State").[9]  In their complaint, the Plaintiffs alleged that the State, as trustee of the state's ceded lands, breached its trust duty "to protect and maintain the[] public trust lands" in the PTA.  The complaint specified that it was not alleging that the United States had violated the terms of its lease, but rather that the State has reason to believe that the lease terms may have been violated and has a trust duty to investigate and take all necessary steps to ensure compliance with the terms of the lease.

According to the complaint, Ching is a descendant of the aboriginal people of Hawaiʻi and engages in native Hawaiian

---

[9]     Under Hawaiʻi Rules of Appellate Procedure Rule 43(c), a public officer named in a case is automatically substituted by his or her successor when the holder of the office ceases to hold office on appeal.  Accordingly, Suzanne Case has been substituted for William J. Aila, Jr., whom she succeeded as Chairperson.

cultural practices, which includes walking in the footsteps of his ancestors on hiking trails located within the PTA. He also participates in other "traditional and customary services" within the PTA, the complaint explained. Kahaulelio is also a descendant of the aboriginal people of Hawaiʻi, the complaint stated. She is at least 50% native Hawaiian and a beneficiary of the Hawaiian Home Lands Trust, the complaint continued, as well as a Hawaiian Home Lands lessee. The complaint further stated that both Ching and Kahaulelio are beneficiaries of the ceded trust lands.

Citing a March 2013 letter by a DLNR staff member, the complaint alleged that the State was aware of the possibility that the land leased to the United States was littered with unexploded ordnance (UXO) and "munitions and explosives of concern."[10] The Plaintiffs asserted that the State did not know whether the United States had complied with the lease because they had taken "no concrete steps to investigate, monitor or ensure compliance" with the lease. Because the State was obligated to protect, care for, and maintain trust property by investigating the United States' compliance with the lease and

---

[10] The Plaintiffs' First Amended Complaint added four paragraphs citing a state-run website and several federal cases that allegedly demonstrated that the State was aware that the United States' military had failed to clean up ordnance on other land leased to the United States.

failed to do so, the Plaintiffs contended that the State "failed to fulfill [its] trust duties with respect to the ceded land leased" to the United States.

The Plaintiffs requested a declaration that the State breached its trust obligations, an order to require the State to fulfill its trust duties with respect to the leased land, and an injunction to bar the State from negotiating an extension of the lease or from entering into a new lease of the PTA until the State ensures that the terms of the existing lease have been fulfilled.[11]

### 2. Motions for Summary Judgment

### a. The Motions

After the State filed its answer, the Plaintiffs filed a Motion for Summary Judgment. In their motion, the Plaintiffs asserted that under article XII, section 4 and article XI, section 1 of the Hawaiʻi Constitution, the State is the trustee of the public ceded lands trust and of public natural resources, and it therefore has a trust duty to "monitor, inspect and investigate to ensure that public trust lands are not being

_____

[11] Approximately one month after the Plaintiffs filed their complaint, the State filed a notice of removal from the circuit court to the United States District Court for the District of Hawaiʻi. The Plaintiffs subsequently filed a motion to remand the case back to circuit court. The federal district court granted the Plaintiffs' motion, concluding that "at issue is a purely state-law breach of trust claim raising numerous questions of fact and substantial questions of Hawaii law regarding the State's obligations as to ceded lands."

damaged--particularly if [it] has reason to believe that trust property is at risk." Despite the State's awareness of the possibility that the terms of the lease may have been violated, the Plaintiffs argued, the State took no steps to ensure compliance with the lease terms. Its failure to investigate the condition of the land, the Plaintiffs contended, fell well below its standard of care and constituted a breach of its trust duties. The Plaintiffs concluded that the equitable relief requested was warranted because they were entitled to prevail on the merits, there was a grave risk posed to the ceded land, and the public interest weighed in their favor.

In its Memorandum in Opposition, the State argued that the Plaintiffs' Motion for Summary Judgment should be denied because the Plaintiffs did not allege that any provision of the lease had been violated, and it asserted that the United States' obligation to clean the leased property will not arise until 2029. In the absence of an alleged breach, the State maintained that the Plaintiffs' claims amounted to "speculation or predictions about future harm" that did not present an "actual controversy" suitable for judicial resolution.

The State also contended that the Plaintiffs were seeking relief that was unavailable under Hawaiʻi Revised Statutes (HRS) § 632-1 (1993), as the relief requested would not bring an end to the controversy or resolve the dispute with

finality.[12]  The State posited that "even if the injunctive

relief sought by Plaintiffs is ordered by the Court, Plaintiffs

will still dispute the extent of any cleanup efforts by the

United States" because the requested relief would require "the

State to engage in some undefined form of oversight of the

United States military."  Therefore, the State concluded, the

Plaintiffs' concerns and the underlying controversy did not meet

the statutory requirements for declaratory relief.

Additionally, the State argued that the Plaintiffs

were not entitled to declaratory relief because the declaratory

judgment statute limits declaratory actions to claims for which

no alternative statutory relief is available.  Here, the State

concluded, HRS § 673-1 (1993) provides a cause of action for

native Hawaiians' to bring a claim for breaches of relevant

---

[12]     HRS § 632-1 provides the following in relevant part:

> Relief by declaratory judgment may be granted in civil
> cases where an actual controversy exists between contending
> parties, or where the court is satisfied that antagonistic
> claims are present between the parties involved which
> indicate imminent and inevitable litigation, or where in
> any such case the court is satisfied that a party asserts a
> legal relation, status, right, or privilege in which the
> party has a concrete interest and that there is a challenge
> or denial of the asserted relation, status, right, or
> privilege by an adversary party who also has or asserts a
> concrete interest therein, and the court is satisfied also
> that a declaratory judgment will serve to terminate the
> uncertainty or controversy giving rise to the proceeding.
> Where, however, a statute provides a special form of remedy
> for a specific type of case, that statutory remedy shall be
> followed[.]

constitutional trusts, and the Plaintiffs were thus obligated to proceed under that statutory framework.[13]

In reply, the Plaintiffs contended that the State was incorrect in asserting that the duty of the United States to clean the property did not arise until the lease expired because Paragraph 9 of the lease required the United States to clean the land during the lease--specifically, when it completed a training exercise. The Plaintiffs also argued that injunctive relief is appropriate "in a case involving a traditional equitable claim when a trustee breaches its fiduciary obligations," noting that HRS § 632-3 (1993)[14] empowers courts to grant ancillary equitable relief. (Citing Food Pantry, Ltd. v. Waikiki Bus. Plaza, Inc., 58 Haw. 606, 613-14, 575 P.2d 869, 875-76 (1978); Natatorium Pres. Comm. v. Edelstein, 55 Haw. 55,

---

[13]     HRS § 673-1 provides in relevant part as follows:

(a) The State waives its immunity for any breach of trust or fiduciary duty resulting from the acts or omissions of its agents, officers and employees in the management and disposition of trust funds and resources of:

. . . .

(2) The native Hawaiian public trust under article XII, sections 4, 5, and 6 of the Constitution of the State of Hawaii implementing section 5(f) of the Admission Act[.]

[14]     HRS § 632-3 provides that "[f]urther relief based on a declaratory judgment may be granted whenever necessary or proper, after reasonable notice and hearing, against any adverse party whose rights have been adjudicated by the judgment."

515 P.2d 621 (1973); King v. Oahu Ry. & Land Co., 11 Haw. 717, 738 (Haw. Rep. 1899).)

The State filed its own Motion for Summary Judgment that restated the arguments from the State's Memorandum in Opposition to the Plaintiffs' Motion for Summary Judgment verbatim.[15]

### b. Supplemental Briefing

After a hearing,[16] the Plaintiffs submitted a Supplemental Memorandum in Support of their Motion for Summary Judgment, which argued that further discovered evidence demonstrated that the DLNR had not conducted an inspection of the PTA since 1984. For example, between 1984 and the start of the current litigation, there had been no communication between the State and the United States regarding compliance with the lease, the Plaintiffs asserted.[17] This demonstrated that the

---

[15] At a hearing regarding the motions, the State also argued that it should prevail on the merits because an internal memorandum attached to its Memorandum in Opposition showed that there were internal discussions at the DLNR regarding the monitoring of the United States' compliance with the lease. This memorandum was sent from the Acting Hawai'i Branch Manager of the Division of Forestry and Wildlife (DOFAW) to the DLNR regarding DOFAW's comments on cancellation and issuance of a new lease with the United States for the PTA. One concern noted by DOFAW was that the United States "should sweep the lands . . . for UXO and remove any UXO found at their expense to make the area safe for the public."

[16] The Honorable Gary W.B. Chang presided.

[17] On November 14, 2014, approximately one month after the hearing and one week before the Plaintiffs filed their supplemental memorandum, the DLNR sent a letter to a United States Army officer requesting the following:

(continued . . .)

15

State had not made a sufficient effort to protect the trust land, the Plaintiffs contended.

In the State's Supplemental Memorandum, it asserted that several records from the lease file showed that it had actively engaged in monitoring since the execution of the lease, including records of one formal inspection of the PTA, maps indicating locations where UXO may be located, reviews of the United States' compliance done in connection with amendments to the lease, and "informal communications" relating to the lease. The State also pointed to a written request it had sent to the United States for a description of its procedures to comply with the lease provisions at issue. The State asserted that the United States responded to the letter "with detailed information about their clean-up and post-training procedures." Because the letter demonstrated that the State had undertaken monitoring of the PTA, it concluded, there was no longer a justiciable controversy.

---

(. . . continued)

> [A] description of the procedures utilized to comply with the[] provisions of Lease No. S-3849, including detailed information about any action taken by the United States following training exercises to remove or deactivate ordnance, as well as actions taken to remove trash or garbage resulting from Government use of the lease premises.

In the Plaintiffs' Reply, they contended that even if the 1984 inspection was "complete and thorough," it is not sufficient to show that the State is currently fulfilling its trust duties because there was no evidence of an inspection since 1984.  Thus, the State failed to demonstrate that it had fulfilled its trust duties, the Plaintiffs concluded.

### c. Orders Denying Summary Judgment

The circuit court denied the Plaintiffs' Motion for Summary Judgment, stating that there were genuine issues of material fact as to whether the State had discharged its trust duties.  The court also denied the State's Motion for Summary Judgment because the court found, inter alia, that there was an "actual controversy regarding whether or not the State ha[d] discharged its responsibilities as a trustee of public lands."

### 3. Motions to Join the United States as a Party

After its Motion for Summary Judgment was denied, the State filed a Motion to Add the United States as a Party or, in the Alternative, for Dismissal in which it argued that under Hawai'i Rules of Civil Procedure (HRCP) Rule 21 (1980), adding the United States was appropriate because, as the lessee of the leased land within the PTA, the United States had a legal and beneficial interest in the subject matter of the Plaintiffs' complaint.  The State also contended that the United States was a necessary party under HRCP Rule 19(a) (2000) because complete

relief could not be accorded in its absence. Resolution of the action would necessarily include an interpretation of the lease provisions, the State contended, and the United States would not be able to defend its interests under the lease if it were not added as a party. And, asserted the State, in the context of leases, Hawaiʻi courts have held that all parties to a lease are necessary parties in any equitable action that interprets or touches upon the lease. (Citing Foster v. Kaneohe Ranch Co., 12 Haw. 363, 365 (Haw. Rep. 1900).)

Finally, the State argued that the United States is an indispensable party under HRCP Rule 19(b) and therefore the suit should be dismissed if it cannot be joined.[18] Under the first factor of HRCP Rule 19(b), a judgment rendered in the absence of the United States would be prejudicial to it because it "would be forced to accept factual findings that directly bear on whether the United States has breached the Lease," the State asserted. Under the rule's second factor, a court could not

_____

[18]    HRCP Rule 19(b) provides that courts should weigh the following factors when determining whether a party is indispensable:

> [F]irst, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

18

shape the relief to ameliorate the prejudicial effect of the judgment because "[n]ew or different monitoring" or limitations on the United States' current use of the land were fundamental to the relief sought by the Plaintiffs, the State argued. Applying the third factor, the State asserted that a judgment rendered in the absence of the United States would be inadequate because the United States was ultimately the party that the Plaintiffs sought to hold responsible for causing the waste of the trust property. And fourth, the State contended that the Plaintiffs had an alternate remedy for their breach of trust claims: an action in federal court that also names the United States or an action brought in state court pursuant to HRS § 673-1.

The Plaintiffs responded that the circuit court should deny the State's motion because, contrary to the State's argument that the Plaintiffs' complaint was based on a violation of the lease, they were asserting "a basic state-law breach of trust claim." The United States was not a necessary nor indispensable party to the case under HRCP Rule 19(a), the Plaintiffs argued, because any effect on federal interests was "purely speculative," and any relief that would require the State to increase its monitoring would not impinge on the United States' rights under the lease because the State already has a right of entry under the lease. And, even assuming the State

were to eventually take actions that affect the United States' interests as a result of a judicial ruling in this case, the United States was well protected because any dispute between it and the State would be decided by an agent of the United States under the lease, the Plaintiffs contended.

Next, the Plaintiffs contended that even if the United States was a party that should be joined if possible under HRCP Rule 19(a), it was not an indispensable party under HRCP Rule 19(b). The rule's first factor weighed against the State, the Plaintiffs argued, because a "judgment [would] not prejudice the interests of the U.S. whatsoever" as it would "not [be] bound by any findings made to a case in which it is not a party." Second, the Plaintiffs asserted that the court could fashion its relief to ensure that the United States does not suffer any prejudice by, for example, ordering the State to provide a report to the court thirty days prior to an annual evidentiary hearing to ensure the State's compliance with the lease. Third, the Plaintiffs stated that it would be able to obtain adequate relief in the absence of the United States. Fourth, the Plaintiffs asserted that they would be "deprived of their day in court if th[e] action were dismissed," which would be inconsistent with Hawai'i Supreme Court decisions holding that beneficiaries must be able to keep government trustees accountable.

20

The United States then filed a statement of interest in which it asserted that it "unquestionably has an interest" in the subject matter of the litigation that was "clearly sufficient" for joinder, if it were feasible.[19]  But joinder was not feasible, it explained, because "such a state action against the United States is barred by its sovereign immunity" and neither party had identified a congressional waiver of sovereign immunity.[20]  The United States asserted that disposition of the action in its absence may impair its ability to protect its interest, making it a necessary party under HRCP Rule 19(a).[21]

---

[19]    Prior to this filing, the court denied without prejudice the State's Motion to Add the United States as a Party, or in the Alternative, for Dismissal "because of the possibility that the United States will make a determination that it has a sufficient interest to appear in this case." After the United States filed its Statement of Interest, the State filed a Motion to Dismiss for Failure to Join an Indispensable Party, or in the Alternative, for Summary Judgment in which it made substantially similar arguments to those made in its first motion as to why the United States was a necessary and indispensable party under HRCP Rule 19.  The latter motion also argued that the action was nonjusticiable because, inter alia, it presented a political question falling within the discretion of the executive branch and the court could not resolve an "actual controversy" due to the vagueness of the requested relief.  For the sake of clarity, this opinion addresses the two motions together with respect to the necessity and indispensability of the United States as a party.

[20]    The United States noted that filing a statement of interest neither constitutes a formal intervention nor makes the United States a party to the proceedings and thus does not amount to a waiver of sovereign immunity.  (Citing M.R. v. Dreyfus, 697 F.3d 706, 735 (9th Cir. 2012).)

[21]    The United States used the PTA, it stated, for "combined live-fire and maneuver training," which "is critical because military operations require significant coordination."  Additionally, the United States explained that the PTA cannot operate as an effective training area without the land leased from the State, because, for safety purposes, the artillery firing ranges contained within the PTA must be situated so that the artillery lands in areas in which soldiers and the general public do not travel.  The leased land provides such safety, the United States noted.  The leased land was also

(continued . . .)

The United States contended that the court could not assess the Plaintiffs' breach of trust claim without "directly or indirectly interpreting the lease and determining factual issues regarding whether the United States has complied with the lease." The Plaintiffs were therefore improperly asking a state court to interpret the United States' obligations under the lease, the United States argued.

The United States also maintained that when a non-party cannot be joined due to sovereign immunity, the first factor--the "extent a judgment rendered in the [party's] absence might be prejudicial to the [party] or those already parties"--takes primary importance and "should weigh heavily in the Rule 19(b) analysis." The Plaintiffs' relief would cause "serious harm" to it, the United States contended, for several reasons. An injunction barring the State from renegotiating the lease would seriously harm the United States because the PTA "is essential for readiness of all the forces" in the Pacific region and there is no other location in the Pacific at which the

---

(. . . continued)

crucial to the United States training operations, it explained, because the land contains (1) a "Battle Area Complex," which "allows soldiers to train and test their ability to detect, identify, engage and defeat stationary and moving targets in both open and urban terrain environments," (2) a "Modular Military Operations in Urban Terrain," which "is designed to look like villages/towns and contains different types of buildings to practice military operations," and (3) the Cooper Airstrip, which "is used to practice launches and recovery of Shadow Unmanned Aircraft."

training done at the PTA could be accomplished, the United States asserted. Additionally, if the court instead ordered the State to conduct inspections of the leased land, such inspections could burden the United States, it contended, because it could disrupt critical training and raise safety issues.

As to the second factor in the HRCP Rule 19(b) analysis, the extent that prejudice can be avoided through the shaping of relief, the United States contended that the Plaintiffs' proffered shaping of relief would put the extension of the lease in doubt or disrupt the military's training.[22] And as to the fourth factor in the HRCP Rule 19(b) analysis, the adequacy of available remedies should the suit be dismissed, the United States argued that "[c]ourts have recognized . . . that the lack of an alternative forum does not automatically prevent dismissal of a suit where the inability results from the non-party's sovereign immunity."[23]

_____

[22] As stated, the Plaintiffs asserted that injunctive relief regarding the lease could be shaped by "enjoin[ing] the defendants from executing an agreement extending the lease or entering into a new lease until the defendants ensure that the terms of the existing lease have been fulfilled." They also contended that the court could shape relief in regards to monitoring by ordering that "the defendants provide a report to [the circuit] court thirty days prior to annual evidentiary hearings on defendants' efforts to ensure compliance with the lease."

[23] The United States did not address the third factor of HRCP Rule 19(b), the adequacy of a judgment rendered in the party's absence.

The United States further stated that, in the event
the case were permitted to go forward and "relief were entered
that impacted the interests of the United States," the United
States "would at that time consider what action to take,
including whether to file a motion to intervene as a party for
the purpose of removing the case to United States District Court
pursuant to 28 U.S.C. § 1442(a)."

The court denied the State's motion without prejudice,
determining that "things may unfold as a matter of proof during
the trial that may implicate some of the arguments being
raised."  Based on the pre-trial record, "the Court believe[d]
it would be improvident to dismiss any of the claims."

## 4. Trial

A bench trial commenced, during which the Plaintiffs
presented a series of witnesses who testified regarding the
DLNR's management of the leased PTA lands.

The Plaintiffs first called Kevin Moore, the DLNR's
custodian of records who responded to the request for government
records that Ching filed before the start of litigation.  Moore
testified that although DLNR's normal practice is to attempt to
inspect leased lands at least once every two years, the leased
PTA land is more difficult to inspect and therefore inspections
are conducted less frequently.  Moore stated that the DLNR's
lease file contained records of only three inspections of the

leased PTA land: one from 1984 that indicated the inspection lasted "no more than one day," which Moore acknowledged was not enough time for an inspector to inspect the 22,900-acre property on foot;[24] one from 1994 that was not signed and did not have anything written in the spaces denoted for the condition of the land or the findings of the inspection; and one from December 2014 that indicated that the premises were in unsatisfactory condition but did not contain any determination as to whether the United States was in compliance with the lease.  Moore also testified that a 2013 memorandum circulated within the DLNR suggested the leased PTA land should be swept for UXO to be removed at the United States' expense, but DLNR did not ask the United States Army (Army) to clean up any ammunition as a result of the memorandum.

Moore related that the State had coordinated with the federal government and its various agencies to undertake a number of projects concerning the condition of the leased PTA land.  Archeological surveys were done in 2001 as part of a Natural Resource Management Plan created by the United States, for instance, and a Programmatic Agreement between state and federal agencies permitted "cultural monitors" to be involved

_____

[24]     Moore stated that it would be difficult for an inspector to inspect the leased land in a motor vehicle due to the rugged terrain.

with inspections. According to Moore, these plans and programs ultimately demonstrated that the Army was the agency primarily responsible for environmental cleanup of the PTA leased land, but they also established that the Hawai'i Department of Health shared responsibility by providing support and regulatory oversight.

The Plaintiffs also called Kealoha Pisciotta, a former cultural monitor for the battle area complex (BAX) within the PTA. Pisciotta testified that during her inspections she observed and noted in her reports a range of debris left over from military exercises, including munitions and UXO, stationary targets, junk cars, an old tank, crudely built rock shelters, and other miscellaneous military rubbish. She testified that some of her reports recommended that the debris be cleaned up, but not all of the UXO that she observed was removed.

Next, the Plaintiffs called Suzanne Case, Chair of the BLNR and the Director of the DLNR. Plaintiffs' counsel showed Case a 2014 action memorandum from the Army addressed to the DLNR stating that a bazooka range within the PTA was heavily contaminated with explosive hazards, ammunitions, and debris that posed a significant danger to public health and welfare. Case testified that she did not remember receiving or having been shown the memorandum by DLNR staff and that she was not aware of any lease compliance issues that had been raised to the

BLNR regarding the PTA lease during her tenure as Chair. She also testified that the DLNR did not have a written policy regarding when inspections of leased premises were to be conducted and instead chose which leases to inspect based on available resources, the risks involved, and whether the public had drawn attention to a specific property.

The Plaintiffs then called Deputy Attorney General William Wynhoff, who had previously testified in a pretrial deposition on behalf of the DLNR. Wynhoff testified that to the best of his knowledge, the DLNR did not have a written procedure to ensure compliance with all terms of the PTA lease. DLNR's practice, Wynhoff stated, is to keep all records related to leases in the lease file. Wynhoff acknowledged that prior to the filing of this suit, there were no documents in the PTA lease file indicating that the DLNR had asked for or received assurances from the United States that it was in compliance with the lease.

Ching testified next. Ching, who is part Hawaiian, stated he was a member of the Pōhakuloa Cultural Advisory Committee, which advised the Army of cultural concerns related to its activities within the PTA. Ching testified that, during his bimonthly trips to the PTA as a member of the committee, he witnessed blank ammunition and other trash and military debris

"strewn around" that negatively affected his spiritual and traditional practices.

After Ching's testimony, the Plaintiffs called Kahaulelio. Kahaulelio testified that she was at least fifty percent Hawaiian and that, to her, caring for the land at Pōhakuloa was a cultural practice. She explained that she and other Hawaiian practitioners participate in cultural ceremonies at Pōhakuloa, which she compared to going to church. Kahaulelio testified that, during one such cultural trip to Pōhakuloa in November 2014, she observed debris and blank ammunition on the ground and that this destruction of the land made her feel "angry" and "hurt."

The Plaintiffs' final witness was Russell Tsuji, a former Deputy Attorney General, State Land Administrator at the DLNR, and Deputy Director of the DLNR. Tsuji stated that, while he was employed at the DLNR, he was in charge of managing state-owned lands and was a custodian of records contained in the PTA lease file. None of the files in the PTA lease file, Tsuji testified, mentioned paragraphs 9 and 14 of the lease. He was also unaware of any conversations that occurred during his employment at the DLNR regarding compliance with these lease provisions. Tsuji explained that his goal was to have land agents inspect leases at least once every two years while he was employed at the DLNR, but he stated that this target was

"aspirational" rather than a mandatory rule. Tsuji acknowledged that prior to the initiation of the lawsuit, the leased PTA land had not been inspected during his tenure at the DLNR, which spanned ten years.

Tsuji testified that the DLNR's PTA lease file contained a series of letters and reports from the United States Army that documented a need to clean up the leased PTA land, including a 2006 report indicating that there was debris in the BAX within the PTA; a 2008 report stating that there may have been munitions on PTA land; a 2013 final environmental impact statement (EIS) stating that UXO was "known to exist in impact area" and that "there [was] also a medium risk of finding [UXO] outside [the construction] area"; and a 2014 report stating that "[t]he military need[ed] to implement some kind of clean-up process as part of their training in PTA" because "[r]emnants of military trash [was] everywhere . . . . including unexploded ordnance that [was] carelessly discarded." When asked about the DLNR's response to one of the reports, Tsuji testified that he did not know if anyone at the DLNR "actually read" the report and noted that there was no record on file that the DLNR ever responded to the report.

Tsuji testified that, after the lawsuit was filed, he sent a letter to the Army requesting its procedures for cleaning munitions after training exercises. Tsuji indicated that the

Army responded by sending a letter setting forth its cleanup procedures. Tsuji also testified that he conducted an inspection of the leased PTA land in December 2014, approximately one year after receiving the Army's response. One of the reasons for the inspection was the lawsuit, Tsuji acknowledged. During this inspection, he observed trash, "[s]pent shells," "shell debris," and "derelict vehicles" used as target practice at the bazooka range. According to Tsuji, a draft inspection report was created after the inspection, which was revised after he conducted another inspection in January 2015. Tsuji indicated that the final report stated that the land condition was "unsatisfactory," but he testified that the DLNR did not issue a default notice to the Army.[25]

At the conclusion of Tsuji's testimony, the Plaintiffs rested. The State did not call any witnesses.

### 5. The Circuit Court Decision

On April 3, 2018, the circuit court issued its Findings of Fact, Conclusions of Law and Order.

### a. Findings of Fact

The circuit court made the following relevant findings of fact.

---

[25] Tsuji testified that the report was written by a land agent and that he had no input in the report's conclusion that the land was "unsatisfactory."

In 1964, the State entered into a sixty-five year lease of three parcels of land in the Pōhakuloa area with the United States for military training purposes. These land parcels are ceded lands owned by the State that are part of the public lands trust. The public trust lands are state-owned lands held for the use and benefit of the people of the State of Hawaiʻi, and the State is the trustee of such lands. Accordingly, the State has "the highest duty to preserve and maintain the trust lands."[26]

The Plaintiffs had in the past and continued to be actively engaged in cultural practices upon the leased PTA land. These cultural practices included song, dance, and chant about the PTA area, walking upon and celebrating the land and the flora and fauna that grow upon it, and honoring the current and historic cultural significance of the area.

The State was aware of the United States' failure to clean up other sites in the state[27] and of the possibility that

---

[26] Throughout its findings of fact and conclusions of law, the circuit court referred to this obligation as the duty to "malama ʻaina," which the court translated as "to care for the land."

[27] Specifically, the court found that the previous Chair of the DLNR, William Aila, Jr., was aware of the United States' failure to clean up other sites in the state such as Kahoʻolawe, Mākua, and the Waikāne Valley, and the court imputed this knowledge to the State in this case. The court noted that a website maintained by the State contained a history of the island of Kahoʻolawe that explained that the United States Navy did not clear all UXO from 25 percent of the surface of the island. Additionally the court found that the United States' failure to properly clean the Mākua area was

(continued . . .)

UXO and munitions were present on the leased PTA land. Cultural monitors spent "extensive time" at the leased PTA land and observed military debris on the ground, including UXO and "spent shell casings, scattered across" the land. The concerns of the cultural monitors were documented in a number of federal reports. For example, the United States prepared a November 2010 report entitled "Final Archaeological and Cultural Monitoring of Construction of Battle Area Complex (BAX) for Stryker Brigade Combat Team (SBCT), Pohakuloa Training Area, Hawaiʻi Island, Hawaiʻi" that included a recommendation from cultural monitors that "[t]he Military needs to implement some kind of cleanup process as part of their training in PTA. Remnants of military trash are everywhere." (Emphasis omitted.) The report also stated that the cultural monitors voiced the following: "Another major concern is the military debris that is left behind after training including [UXO] that is carelessly discarded. There is a need to have some type of cleanup plan implemented in the military training process."

---

(. . . continued)

documented in the federal court decisions in Makua v. Rumsfeld, 163 F. Supp. 2d 1202 (D. Haw. 2001), Mâkua v. Gates, Civ. No. 08-00327 SOM/LEK, 2009 WL 196206 (D. Haw. Jan. 23, 2009), and Mâkua v. Gates, Civ. No. 00-00813 SOM, 2008 WL 696093 (D. Haw. Mar. 11, 2008).

These concerns were reiterated four years later in a second, similarly titled report.  This report contained observations from cultural monitors who stated that "[r]emnants of live fire training are present within the BAX, including stationary targets, junk cars, an old tank, crudely built rock shelters, and miscellaneous military rubbish.  Spent ammunition is scattered across the landscape."  The report noted the cultural monitors feared that if the litter continued to remain on the land, "the land will be rendered unusable forever--one eighth of our island will become unavailable for use by any of our future generations."  The cultural monitors therefore "strongly recommend[ed] the Army begin now to seek funding to initiate a serious cleanup effort throughout the leased training areas."  (Emphasis in report.)

Additionally, a March 2015 draft report stated that, based on a 2014 inspection by the DLNR and the Army, a bazooka range contained on the leased PTA land was "heavily contaminated on the surface with material potentially presenting an explosive hazard [] and munition debris []."  A subsequent inspection of the bazooka range by military explosive ordnance disposal units found mortars, bazooka rounds, and white phosphorous on the land.  The Army determined that the debris found at the bazooka range "coupled with the accessibility to the public make for the potential for significant danger to public health and welfare."

The State's awareness of the potential contamination of the leased PTA land was also demonstrated by a March 2013 letter from the Acting Hawaiʻi Branch Manager for the DLNR to the State Lands Assistant Administrator. The Branch Manager recommended that "PTA should sweep the lands North of the saddle road for UXO and remove any UXO found at their expense to make the area safe for the public."[28] Additionally, a March 2013 Final EIS stated that "[d]ecades of using PTA as a training area have introduced a significant risk of encountering [munitions]/UXO. [Munitions]/UXO [are] known to exist in the impact area and [are] expected to be encountered during range construction activities; but there is also a medium risk of finding [munitions]/UXO outside the impact area." The EIS also stated that "[p]ast and current activities at PTA have resulted in contamination of soil by explosives and other chemicals." Therefore, the State was aware that military training activities on the leased PTA land "pose[d] a significant and substantial risk of harm or damage to [the PTA], and persons who may come upon" the land, and "to public health, safety, and welfare, as well as to the Plaintiffs' cultural interests in the [land]."

---

[28] Although the letter stated, "PTA should sweep," it appears that the Branch Manager was referring to the United States.

Proper stewardship of the leased land includes "periodic and meaningful inspection and monitoring of the military training activities and their aftermath upon the Subject Lands and reasonably accurate documentation of such activities and the effects of such activities to achieve transparency of [the State's] inspection and monitoring actions." Inspections must occur with "a reasonable frequency" for the State to satisfy its duty. The DLNR did not meet its informal goal of inspecting the leased PTA land once every two years, nor did it adequately document its inspection efforts "so as to provide rudimentary transparency into the DLNR's efforts." An inspection of the PTA occurred on December 19, 1984, for which a "sparse" report was generated that stated only the following: "Property being used for Military training purposes per lease terms." Another inspection "appear[ed] to have been conducted" in 1994, although the "findings" and "inspected by" sections of the inspection form were blank.

A third inspection occurred on December 23, 2014, after the litigation in this case had begun, and this inspection resulted in a report that "contained much more information" than those created from the two previous inspections. The 2014 Inspection Report stated that the condition of the land was "not

satisfactory."[29]  The report indicated that debris was "extensive" at the bazooka range, that there were "derelict vehicles" at one of the target ranges, and that an area was used for dumping spent artillery shells.

"The lack of regular, meaningful inspection and monitoring of the" leased PTA land contributed to the breach of the State's trust duties, which in turn "harmed, impaired, diminished, or otherwise adversely affected Plaintiffs' cultural interest in the" leased land.

### b. Conclusions of Law

The circuit court rendered the following relevant conclusions of law.

The Plaintiffs had standing to enforce a breach of trust claim against the State, and the United States was not an indispensable party to the case because the Plaintiffs' claim concerned only the State's trust obligations.  The State, as trustee of the ceded land, owed a "high standard of care when managing public trust ceded lands."  The State's trust duties include but are not limited to using "reasonable efforts" to (1) preserve and protect trust property, and (2) take a proactive

---

[29]  The court found that the Army's assertion recorded in the report that it "regularly inspected and cleaned up after [an] exercise was complete" was contradicted by evidence that there was a significant amount of debris and ammunition on the land.

role in management and protection of the trust property.  The State had a duty to consider the cumulative effects of the United States' use of the land upon the condition of the land and upon "the indigenous plants, animals, and insects, as well as the invasion to Plaintiffs' cultural interests in the Subject Land."  Additionally, the State had a duty to determine whether the lessee was in compliance with the terms of the lease.  And the Chair of the BLNR specifically had a duty to "[e]nforce contracts respecting . . . leases . . . or other disposition of public lands."  (Quoting HRS § 171-7(5).[30])

As part of its trust duties, the State was required, to enforce paragraphs 9, 14, 18, and 19 of the PTA lease.  The State's records regarding its efforts to inspect the leased land and report its findings "were spotty at best" and in some cases "grossly inadequate."[31]  Although there were studies and inspections completed regarding "other business" on the leased land, such as the EIS, these were not conducted to fulfill the State's trust duties.

---

[30]     HRS § 171-7(5) (2011) provides, in relevant part, "Except as provided by law the board of land and natural resources through the chairperson shall: . . . (5) Enforce contracts respecting sales, leases, licenses, permits, or other disposition of public lands[.]"

[31]     The court found that, given "the virtual nonexistent nature of the 1994 inspection report" and "the sparse and incomplete nature of the 1984 inspection report," there was an unrebutted presumption that the State had failed to conduct any inspections prior to December 2014 to monitor or confirm the United States' compliance with paragraphs 9, 14, 18, and 19.

The State therefore breached its duties by failing to (1) conduct reasonable (in terms of frequency and scope) inspections of the condition of the leased PTA land or observations of the military training exercises, (2) ensure that the terms of the lease were being followed, (3) take prompt and appropriate follow-up steps with the United States when the State became aware of potential violations of the lease, (4) create detailed reports of the State's efforts to ensure compliance with the lease, and (5) initiate or assist with the appropriation of necessary funding to conduct cleanup or maintenance activities on the land.  The court stated that the State would further breach its trust duties "if they were to execute an extension, renewal, or any other change to the State General Lease No. S-3849, or enter into a new lease of the PTA, without first determining (in writing) that the terms of the existing lease have been satisfactorily fulfilled."

### c. Order

The court explained that because the Plaintiffs prevailed on the merits, the appropriate remedy was for the court to issue an order directing the State to perform its trust duties with respect to the leased PTA land.  The court concluded that the balance of harm favored the issuance of a mandatory injunction and that protection of the public trust lands was in the public interest.  The court therefore ordered that the State

promptly initiate affirmative activity at the PTA in accordance with its trust duties by developing a written plan to fulfill such duties.  The plan was required to include provisions for (1) on-site monitoring and inspections, (2) the creation of written inspection reports with recommendations, (3) a written protocol of appropriate action to be taken if the United States is to be found to be in breach of the lease, (4) a procedure to provide for "reasonable transparency" to the Plaintiffs and the general public with respect to compliance with the injunction, and (5) all steps that the State takes to "secur[e] adequate funding, from any and all appropriate funding sources, to plan, initiate, and conduct all appropriate comprehensive cleanup." The plan was required to be submitted to the court for approval. Additionally, the court ordered the State to create contested case procedures pursuant to HRS Chapter 91, if not already in existence, "for Plaintiffs or any member of the general public with standing to initiate such process in the event that Plaintiffs or other interested party may contest the decisions made by the [State] in the course of discharging" their trust duties.

The circuit court entered Final Judgment on April 24, 2018.

## D. The Appeal and Motions to Dismiss

The Department of the Attorney General (AG) filed a timely Notice of Appeal.  The Plaintiffs filed a Motion to Dismiss the Appeal and argued that the AG did not have the authority to file an appeal "on behalf of BLNR or DLNR without BLNR's consent."[32]  (Citing Chun v. Bd. of Trs. of the Emps.' Ret. Sys., 87 Hawai'i 152, 952 P.2d 1215 (1998).)  The State replied that the AG was authorized to appeal the decision because the AG "has authority to manage and control all phases of litigation" in suits against state officials.  (Citing Island-Gentry Joint Venture v. State, 57 Haw. 259, 554 P.2d 761 (1976).)

The Plaintiffs filed an application for transfer to this court, which the State did not oppose.  This court granted the application on December 20, 2018.

## IV. STANDARD OF REVIEW

Certain decisions regarding the orderly administration of trial and the selection of an appropriate remedy to redress an injury "rest[] with the sound discretion of the trial court[,] and the trial court's decision will be sustained absent

---

[32]    The Plaintiffs later filed a second motion to dismiss to "follow[] up" on the first, making substantially similar arguments with respect to the AG's authority to appeal on behalf of the Chair of BLNR without her express consent.

a showing of manifest abuse of discretion." Hawaii Pub. Emp't Relations Bd. v. United Pub. Workers, Local 646, 66 Haw. 461, 467, 667 P.2d 783, 788 (1983). For instance, this court applies an abuse of discretion standard when it reviews a trial court's determination as to whether to dismiss a case pursuant to HRCP Rule 19(b) for a party's failure to join an indispensable party. UFJ Bank Ltd. v. Ieda, 109 Hawai'i 137, 142, 123 P.3d 1232, 1237 (2005) (citing Takabuki v. Ching, 67 Haw. 515, 529, 695 P.2d 319, 328 (1985)). Similarly, a trial court's grant of equitable relief, including a declaratory judgment or a mandatory injunction, will be upheld unless an abuse of discretion is demonstrated. Kau v. City & Cty. of Honolulu, 104 Hawai'i 468, 473, 92 P.3d 477, 482 (2004) (citing Shanghai Inv. Co. v. Alteka Co., 92 Hawai'i 482, 492, 993 P.2d 516, 526 (2000)); United Pub. Workers, 66 Haw. at 467, 667 P.2d at 788.

By contrast, we review a trial court's conclusions of law de novo. Narayan v. Ass'n of Apartment Owners of Kapalua Bay Condo., 140 Hawai'i 75, 83, 398 P.3d 664, 672 (2017) (citing Nordic PCL Constr., Inc. v. LPIHGC, LLC, 136 Hawai'i 29, 41, 358 P.3d 1, 13 (2015)). Thus, a trial court's grant or denial of summary judgment is reviewable using our independent judgment under the right/wrong standard, as are the statutory and constitutional interpretations underlying the court's

41

determinations.  Id.; State v. March, 94 Hawai'i 250, 253, 11 P.3d 1094, 1097 (2000).  But this court will uphold the findings of fact to which the trial court applies these interpretations unless they are clearly erroneous.  Noel Madamba Contracting LLC v. Romero, 137 Hawai'i 1, 8, 364 P.3d 518, 525 (2015).

## V. DISCUSSION

### A. The Motions to Dismiss

Before addressing the merits of the State's appeal in this case, we must first consider the Plaintiffs' motions to dismiss asserting that the AG lacked authority to bring the appeal without the express authorization of the BLNR and, derivatively, the authorization of the Board's Chairperson and the DLNR, which the Board heads.  This court first addressed the allocation of litigation authority between the AG and other government agencies in Island-Gentry Joint Venture v. State, 57 Haw. 259, 264, 554 P.2d 761, 765 (1976).  In Island-Gentry, the BLNR agreed to a financial settlement with a landowner after it breached a purchase agreement to acquire the owner's property in order to build a school.  Id. at 261, 554 P.2d at 763.  Upon discovering that the landowner had thereafter sold the land to a third party for over twice the BLNR's agreed-upon purchase price, the AG declined to pay the agreed-upon settlement, reasoning that the landowner had "suffered no damage resulting from [the] State's failure to honor its agreement to purchase

42

the land." Id. at 262, 554 P.2d at 764. The landowner brought suit to enforce the settlement.

This court held that under the general grant of authority contained in HRS § 26-7 (Supp. 1975),[33] the AG "has exclusive authority to control and manage for the State all phases of civil litigation in which the State has an interest, unless authority to do so in specific matters has been expressly or impliedly granted to another department or agency." Id. at 264-65, 554 P.2d at 765-66. We held that this authority necessarily includes the authority to control the settlement of actions against the State. Id. at 265, 554 P.2d at 766. The same section also grants the AG "exclusive authority to approve as to the legality and form of all documents relating to the

---

[33] The portions of HRS § 26-7 cited in Island-Gentry have not been amended since this court's decision in the case. The statute provides in relevant part as follows:

> The department of the attorney general shall be headed by a single executive to be known as the attorney general.
>
> The department shall administer and render state legal services, including furnishing of written legal opinions to the governor, legislature, and such state departments and officers as the governor may direct; represent the State in all civil actions in which the State is a party; approve as to legality and form all documents relating to the acquisition of any land or interest in lands by the State; and, unless otherwise provided by law, prosecute cases involving violations of state laws and cases involving agreements, uniform laws, or other matters which are enforceable in the courts of the State. The attorney general shall be charged with such other duties and have such authority as heretofore provided by common law or statute.

acquisition of any land or interest in land by the State," we noted. Id. This court held that implicit in these express grants of authority was the "sole power to approve or to refuse to approve as to the legality and form of any compromise settlement effectuated by the [BLNR] in regards to the [BLNR]'s breach of a contract to purchase land for the State." Id. Because the record identified that "no other department or agency ha[d] been expressly or impliedly granted the authority to approve or to disapprove as to the legality and form of the settlement in question," we held that the BLNR was without authority to bind the State to the settlement. Id.

Chun v. Board of Trustees of the Employees' Retirement System, 87 Hawaiʻi 152, 952 P.2d 1215 (1998), on which the Plaintiffs rely, stands in tension with Island-Gentry. In Chun, the circuit court vacated a decision of the Board of Trustees of the Employees Retirement System concerning the retirement benefits of a group of teachers and school administrators, finding that the Board had miscalculated the benefits as a result of its misinterpretation of the applicable statute. Id. at 158, 952 P.2d at 1221. During the pendency of the case, the composition of the Board had changed, and the newly constituted Board deadlocked in a four-to-four vote on a motion to authorize an appeal of the circuit court's decision. Id. at 160, 952 P.2d at 1223. The Chairperson of the Board thus sent a letter

informing the AG that the "motion failed because it did not receive the necessary majority vote."  Id. at 161, 952 P.2d at 1224.  When the AG nevertheless filed a notice of appeal, the retirees filed a motion to dismiss the appeal, arguing that the AG had no independent authority to pursue it without the Board's consent.  Id.

This court held that a distinction exists between, on the one hand, the AG's duty under HRS § 28-1 (1993)[34] and the common law to represent the State in furtherance of the public interest as the AG deems it to be, and on the other hand, the AG's duty under HRS § 26-7 to serve as legal counsel to the public officials and instrumentalities of the State, inter alia, when they are sued in their professional capacity.  Id. at 170, 952 P.2d at 1233.  Extensively quoting the Supreme Court of West Virginia, we stated,

> When the Attorney General appears in a proceeding on behalf of the state in her name, she exercises her discretion as to the course and conduct of the litigation.  She assumes the role of a litigant and she is entitled to represent what she perceives to be the interest of the state and the public at large.
>
> . . . .
>
> The Attorney General performs quite a different function when she appears to defend a state officer or

---

[34]    HRS § 28-1, which has not been amended since this court's decision in Chun, provides as follows: "The attorney general shall appear for the State personally or by deputy, in all the courts of record, in all cases criminal or civil in which the State may be a party, or be interested, and may in like manner appear in the district courts in such cases."

> instrumentality sued in their official capacity. In this circumstance the Attorney General does not appear as a party to the action. That role is filled by the state officer or instrumentality against whom the suit is brought. Rather, the Attorney General's function is to act as legal advisor and agent of the litigant and to prosecute or defend, within the bounds of the law, the decision or policy of such officer or instrumentality which is called into question by such lawsuit.
>
> . . . .
>
> The Legislature has designated the Attorney General as the legal representative of state officers and instrumentalities sued in their official capacities. In the absence of other statutory or constitutional provision to the contrary, she is their sole legal representative in the courts and they are her clients. When the Attorney General appears in litigation in this capacity, she does so as a lawyer and an officer of the court. Her primary responsibility is to provide proper representation and competent counsel to the officer or instrumentality on whose behalf she appears. The Attorney General's role in this capacity is not to make public policy in her own right on behalf of the state. It is presumed, in the absence of a contrary showing, that the officer made a party to the suit has, in the performance of his or her official duties, acted in contemplation of the relevant laws and in the best interests of the state. The Attorney General's role and duty is to exercise her skill as the state chief lawyer to zealously advocate and defend the policy position of the officer or agency in the litigation.
>
> The Legislature has thus created a traditional attorney-client relationship between the Attorney General and the state officers or instrumentalities she is required to represent. It is well settled that in the control of litigation, the Attorney General has the duty to conform her conduct to that prescribed by the rules of professional ethics. As a lawyer and an officer of the courts of this State, the Attorney General is subject to the rules of this Court governing the practice of law and the conduct of lawyers, which have the force and effect of law.

Id. at 171-73, 952 P.2d at 1234-36 (quoting Manchin v. Browning, 296 S.E.2d 909, 918-20 (W. Va. 1982)) (alterations omitted) (emphases added). This court thus held that when the AG represents a state official or instrumentality in its official capacity, the official or instrumentality is the AG's client and

the allocation of authority in that relationship is governed by at least some provisions of the Hawai'i Rules of Professional Conduct (HRPC). Id. at 173-74, 952 P.2d at 1236-37.

Applying HRPC Rule 1.7, which governs conflicts, this court held that, once the AG has informed the state official or instrumentality of the different legal strategies and defenses available and provided a professional opinion as to their advisability, the AG "should then stand aside and allow [the] client to exercise [] independent judgment on which course to pursue." Id. at 174, 952 P.2d at 1237 (emphasis and alterations omitted) (quoting Manchin, 296 S.E.2d at 920). Because the AG's position in pursuing the appeal was at odds with the Board's wishes, this court held that the AG "was ethically obligated to recommend the retention of other counsel to represent the Board and to take such other action as, in her opinion, the circumstances required." Id. at 176, 952 P.2d at 1239. The AG lacked authority, however, to pursue the appeal without the Board's consent. Id. at 177, 952 P.2d at 1240.

In a footnote in Chun, the court asserted that its holding was consistent with Island-Gentry, focusing on the Island-Gentry court's statement that the AG has ultimate authority to make litigation decisions "unless authority to do so in specific matters has been expressly or impliedly granted to another department or agency." 87 Hawai'i at 171 n.21, 952

47

P.2d at 1234 n.21 (emphasis omitted) (quoting Island-Gentry, 57 Haw. at 264-65, 554 P.2d at 765-66). The court stated that, unlike with the BLNR in Island-Gentry, the legislature had enacted a series of laws that conferred upon the Board of Trustees of the Employees Retirement System "the powers and privileges of a corporation," including the powers to "sue or be sued and transact all of its business." Id. (citing HRS §§ 88-22, 88-23, 88-110). These statutes acted to divest the AG of the authority to control litigation with respect to the Board, the court reasoned. Id.

This distinction is problematic, however. Analogous statutes existed conferring substantially the same authority on the BLNR at the time Island-Gentry was decided. See, e.g., HRS § 171-7(8) (1968) ("Except as provided by law the board of land and natural resources through the chairman shall: . . . (8) Bring such actions and proceedings as may be necessary to carry out the powers and duties of the board in the name of the State and to defend such actions brought against the State as may be authorized[.]"). Moreover, the Chun court based its analysis not on the withdrawal of the general authority of the AG under HRS §§ 28-1 and 26-7 by another statute, but rather on the distinction between the different aspects of that authority. See 87 Hawai'i at 169-70, 952 P.2d at 1232-33 ("Thus, by [its] terms, HRS § 26-7 . . . designate[s] the attorney general as

48

legal counsel for 'public officers' and instrumentalities of the state[.] . . .  At the same time, however, HRS § 28-1 mandates that the attorney general 'represent the State in all . . . civil matters where the State . . . may be an interested party.'" (some alterations original)).

The cases can be more logically reconciled in two ways.  First, because Island-Gentry concerned the settlement of litigation arising directly from a breach of a contract to acquire public lands, approval of the settlement agreement fell within the AG's "exclusive authority" under HRS § 26-7 "to approve as to the legality and form of all documents relating to the acquisition of any land or interest in land by the State." And second, the settlement agreement essentially "commit[ed] the State to an obligation to pay a sum of money out of State funds"--which was authority that had not been granted to BLNR. Island-Gentry, 57 Haw. at 264, 554 P.2d at 765.

Thus, Chun should be read as limiting Island-Gentry to situations when the AG appears on behalf of the State generally (as opposed to on behalf of a specific State public official or instrumentality), when the action falls within the AG's exclusive statutory authority, or when the result of the action would commit the State to pay public funds that have not been appropriated to the represented State official or instrumentality.  By contrast, when the AG appears on behalf of

49

a specific State official or instrumentality and the above exceptions do not apply, the AG has a duty to comply with the wishes of the represented party that is loosely analogous to the duty a private attorney owes a client under the HRPC and other professional standards.[35]  Chun, 87 Hawaiʻi at 173, 952 P.2d at 1236.

The Plaintiffs argue that, in the absence of an affirmative vote by the BLNR, the AG was not authorized to bring an appeal in the present case.  Yet our precedent and legal professional standards more generally permit--and in some cases require--an attorney to take the procedural steps necessary to protect a client's right to appeal.  See Maddox v. State, 141 Hawaiʻi 196, 204, 407 P.3d 152, 160 (2017) ("Defense counsel should take 'whatever steps are necessary' to protect the client's right to appeal . . . ." (quoting ABA Standards for Criminal Justice: Prosecution and Defense Function, Standards 4–8.2(b), 4-8.3(c) (3d ed. 1993))).  Unlike in Chun, in which the Chairperson of the Board sent a letter "informing [the AG] of

---

[35]    By so holding, the autonomy of the various agencies that are headed by boards instead of a single executive is preserved, as the framers intended such boards to maintain a level of independence from the governor and officials like the AG who are directly answerable to the governor.  See Stand. Comm. Rep. No. 67 in I Proceedings of the Constitutional Convention of Hawaii of 1950, at 217 (1960) ("Your committee has followed the principle that the Governor should be strong in his branch of the government but that he should be precluded from infringing upon the other branches, for example, the power to remove members of the boards and commissions.").

the Board's refusal to authorize an appeal of [the circuit court's] decisions," there is no indication in the record that the BLNR communicated to the AG a desire not to pursue the present appeal--nor is there any evidence that the appeal is at odds with the BLNR's wishes. 87 Hawai'i at 161, 952 P.2d at 1224 (second alteration original). "[W]here no conflict plainly appears . . . it is generally presumed 'that the actions and determinations of the Attorney General in . . . a lawsuit are made both as a representative of the public interest and as counsel for the state agency or officer.'" Id. at 170, 952 P.2d at 1233 (some alterations in original) (quoting D'Amico v. Bd. of Med. Exam'rs, 11 Cal.3d 1, 112 (1974)). Accordingly, we deny the Plaintiffs' two motions to dismiss the appeal.

## B. The State's Appeal

The State argues that the circuit court erred by failing to dismiss the case or grant summary judgment to the State on the grounds that 1) the United States was a necessary and indispensable party under HRCP Rule 19 whose joinder was not feasible due to its sovereign immunity; 2) the case presented a nonjusticiable political question regarding how the State should manage the leased PTA land; and 3) the case did not present an "actual controversy" in which a declaration could "terminate the

51

uncertainty or controversy giving rise to the proceeding" as is required for declaratory relief under HRS § 632-1.[36]  The State additionally challenges the circuit court's findings and conclusions insofar as the court found that the State breached its trust duties by failing to perform adequate inspections of the leased PTA land and declined to consider the State's cooperative activities with entities other than the State in determining whether the State had violated its trust obligations.  Lastly, the State argues that the injunctive relief granted by the circuit court was improper because it was tantamount to an award of damages barred by the State's sovereign immunity and the order granting relief was vague, overbroad, and improperly intruded on legislative prerogatives.

This opinion will address the State's contentions alleging related errors together.

## 1. The United States Is Not a "Necessary" Party and Therefore Is Not "Indispensable"

The State contends that the United States is a necessary and indispensable party to the present case under HRCP Rule 19 and that the circuit court reversibly erred by failing

---

[36]     Under Hawai'i law, the denial of a summary judgment motion can be appealed following a trial on the merits only if the appeal centers on a question of law rather than the existence of a disputed material fact.  See Larsen v. Pacesetter Sys., Inc., 74 Haw. 1, 17-18, 837 P.2d 1273, 1282-83 (1992).  Here, the State's contentions are rooted in questions of law, and we accordingly conclude that it is entitled to review of the circuit court's denial of its summary judgment motion on the challenged grounds.

to either join the United States or dismiss the case due to its absence. Under our precedents, an analysis under HRCP Rule 19 follows two steps. Kellberg v. Yuen, 135 Hawai'i 236, 250-51, 349 P.3d 343, 357-58 (2015). First, courts must determine if the party is a "necessary" party under part (a) of the rule, and if so, whether joinder of the party is feasible. Id. If the court finds that a party is necessary and joinder is not feasible, it then proceeds to part (b) of the rule, under which it analyzes whether "in equity and good conscience" the case can continue in the party's absence. Id. at 252, 349 P.3d at 359 (quoting HRCP Rule 19(b)). "If, under this second step, the court dismisses the action rather than moving forward without the absent party, the nonparty is described as 'indispensable.'" Id. (quoting Marvin v. Pflueger, 127 Hawai'i 490, 499, 280 P.3d 88, 97 (2012)).

HRCP Rule 19(a) sets forth a number of factors for courts to consider in evaluating whether an entity is a necessary party who should be joined if feasible. The rule provides, in relevant part, as follows:

> (a) Persons to be joined if feasible. A person who is subject to service of process shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (A) as a practical matter impair or impede the person's ability to protect that interest or (B) leave any of the persons already parties subject to a substantial risk of incurring double,

53

multiple, or otherwise inconsistent obligations by reason of the claimed interest.

With respect to HRCP Rule 19(a)(2),[37] this court does not need to speculate as to the interest claimed by the United States in the subject matter of this case because the United States filed a statement of interest in the circuit court. Before this court, the State repeats the United States' assertion that "[t]he action here relates to the public land leased by the State to the United States for military purposes and puts directly at issue the United States' compliance with the terms of the lease." The State contends that the United States clearly has an interest in an action "forcing the State to initiate rigorous enforcement action against" the United States.

But determining whether the State fulfilled its duties as trustee in this case does not require determining whether the United States in fact complied with the lease, however, and if a breach of the State's trustee duties is found, the appropriate remedy would not be an order requiring the State to initiate an enforcement action. Article XI, section 1 of the Hawaiʻi Constitution places upon the State a fiduciary duty analogous to

---

[37] Neither the State nor the United States make any arguments with respect to HRCP Rule 19(a)(1), under which the court would consider whether the United States' absence would prevent complete relief from being afforded in this case.

the common law duty of a trustee with respect to lands held in public trust. See In re Conservation Dist. Use Application HA-3568 (In re TMT), 143 Hawaiʻi 379, 400, 431 P.3d 752, 773 (2018); State ex rel. Kobayashi v. Zimring, 58 Haw. 106, 121, 566 P.2d 725, 735 (1977). Article XII, section 4 imposes a similar duty regarding lands ceded to the State under Section 5(b) of the Admission Act. It is undisputed that the leased PTA land at issue in this case is trust land within the meaning of these constitutional provisions.

The most basic aspect of the State's trust duties is the obligation "to protect and maintain the trust property and regulate its use." Zimring, 58 Haw. at 121, 566 P.2d at 735; accord Restatement (Second) of Trusts § 176 (1959) ("The trustee is under a duty to the beneficiary to use reasonable care and skill to preserve the trust property."). Under the common law, this obligation includes an obligation to reasonably monitor the trust property. See Restatement (Third) of Trusts § 90 cmt. b (2007); Tibble v. Edison Int'l, 135 S.Ct. 1823, 1828 (2015). This duty exists regardless of whether the property is being used by a third party pursuant to a lease.

Reasonable monitoring ensures that a trustee fulfills the mandate of "elementary trust law" that trust property not be permitted to "fall into ruin on [the trustee's] watch." United States v. White Mt. Apache Tribe, 537 U.S. 465, 475 (2003). To

hold that the State does not have an independent trust obligation to reasonably monitor the trust property would be counter to our precedents and would allow the State to turn a blind eye to imminent damage, leaving beneficiaries powerless to prevent damage before it occurs.  Cf. Kelly v. 1250 Oceanside Partners, 111 Hawai'i 205, 231, 140 P.3d 985, 1011 (2006) (holding that the Department of Health's article XI, section 1 public trust duty to protect coastal waters required it to "not only issue permits after prescribed measures appear to be in compliance with state regulation, but also to ensure that the prescribed measures are actually being implemented." (emphasis added)).

Thus, the State might breach its fiduciary duty by failing to reasonably monitor public ceded lands, including the public ceded lands within the PTA that the United States utilizes pursuant to its lease with the State.  Such a breach would be complete upon the State's failure to reasonably monitor the ceded land--irrespective of whether the United States actually violated the lease.  A determination of whether the State breached its duty by failing to monitor the United States' compliance with the lease therefore will not require a subsidiary determination that the United States breached the terms of the lease, and thus it will not impair the United States' ability to defend itself against any such speculative

56

future claim.  And because the court would not be determining whether the United States violated the terms of the lease, the appropriate remedy for the alleged breach of the State's trust duties would be an order requiring the State to initiate appropriate monitoring--and not an order requiring the State to initiate an enforcement action.

The United States further asserted in its statement of interest that an order requiring the State to inspect or monitor the United States' use of the PTA "at specified times" has the potential to disrupt critical training exercises.  In a similar vein, the State argues that the disposition of the case could put the State at risk of incurring inconsistent obligations because the United States may deem the required monitoring to be "[un]reasonable" or determine that it "unduly interfere[s]" with training operations, ultimately leading to a separate determination under the lease's dispute resolution mechanism. However, these concerns were speculative.  Under paragraph 19 of the lease, the State "shall have the right to enter upon the demised premises at all reasonable times to conduct any operations that will not unduly interfere with activities of the [United States]."  And while this right of entry is subject to advance clearance from the United States, the lease specifies "that such advance clearance shall not be unreasonably held." There was no indication at the time the State's motions were

determined that the extent of the monitoring the court might order would necessarily be inconsistent with the State's rights under the lease so as to prejudice the United States' interests or subject the State to conflicting obligations.[38]

The United States also asserted in its statement of interest that courts have recognized that all parties to a contract are necessary parties in any equitable action that requires interpretation of the contract. As an initial matter, a reading of the unambiguous text on the face of the lease does not require "interpretation" of the contract. See Airgo, Inc. v. Horizon Cargo Transp., Inc., 66 Haw. 590, 594, 670 P.2d 1277, 1280 (1983) (stating that a contract is ambiguous "when the terms of the contract are reasonably susceptible to more than one meaning"). Further, the cases cited by the United States are inapposite and do not support its position. Each case involved an action that sought to invalidate, enforce, or

_____

[38] Even if concerns that the State would be subject to inconsistent obligations resulting from the dispute resolution mechanism were sufficient to make the United States a necessary party, the United States correctly asserts that it is not feasible to join it as a party because Congress has not waived sovereign immunity to allow the United States to be involuntarily made a party to the case in Hawai'i state courts. See Minnesota v. United States, 305 U.S. 382, 388 (1939). In determining whether a case should be dismissed for failure to join an indispensable party under HRCP Rule 19(b), courts must consider "the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided." In this case, the remedy could be tailored to avoid subjecting the State to inconsistent obligations by simply ordering the State to engage in monitoring consistent with its rights under the lease. Thus, dismissal would not be warranted even if the United States were to be considered a necessary party.

establish a breach of the terms of the contract at issue.[39]

These cases did not hold that parties to a contract must be

joined in any action regarding a trustee's duty to reasonably

monitor the property that is the subject of the contract.

Unlike the cited cases, this action seeks neither to invalidate

the lease nor to directly enforce its terms but rather to

require the State to monitor the leased PTA land and the United

States' compliance with the lease.  The cited cases thus do not

apply.[40]

The United States contended and the State similarly

argues that an injunction barring the State from renegotiating

the lease until any breach of its terms is cured would adversely

impact the United States' interests directly by inhibiting its

right to renew the lease and indirectly by undermining its

ability to make future plans for the PTA.  This presumes,

---

[39] See Dawavendewa v. Salt River Project Agr. Imp. & Power Dist., 276 F.3d 1150, 1157 (9th Cir. 2002) (holding that a Native American tribe was necessary and indispensable in a suit alleging that hiring preference for Native Americans in contract between the tribe and public power company violated civil rights laws); McClendon v. United States, 885 F.2d 627, 633 (9th Cir. 1989) (holding a Native American tribe indispensable in an action to enforce the terms of a rental lease to which the tribe was a party); Queen's Med. Ctr. v. Kaiser Found. Health Plan, Inc., 948 F.Supp.2d 1131, 1165 (D. Haw. 2013) (holding that a health management network was a necessary party in a suit that required demonstrating it had breached the contract to which it was a party).

[40] To be clear, this opinion does not find or conclude that the United States has breached the lease, nor does it enforce or invalidate any provision of the lease.  To the extent any portion of the circuit court's judgment can be interpreted as rendering such a finding, conclusion, or order, we hold that this interpretation is incorrect, and the circuit court's judgment shall be construed consistent with this opinion.

however, that the court was required to provide all of the precise remedies that the Plaintiffs requested.  It is well settled that in an equitable action, a court has "broad discretionary power to . . . craft remedies to preserve equity." Ito v. Inv'rs Equity Life Holding Co., 135 Hawaiʻi 49, 62, 346 P.3d 118, 131 (2015).  Courts may use this discretion to devise remedies that avoid prejudicing the rights of an absent party, and this latitude should be considered in determining whether a party is necessary and should be joined if feasible.  See Salt Lake Tribune Pub. Co. v. AT&T Corp., 320 F.3d 1081, 1097 (10th Cir. 2003) ("Tribune Publishing mistakenly assumes that the only remedy that will give it complete relief is an order compelling KTLLC to specifically perform under the Option Agreement with respect to every Tribune Asset it owns.  An order of complete specific performance is one way in which Tribune Publishing can receive complete relief, but it is not the only way.").  Thus, the fact that the Plaintiffs requested a remedy barring the renegotiation of the lease does not alter our determination that the circuit court did not abuse its discretion in concluding that the United States is not a necessary party to the action. (Indeed, the circuit court did not ultimately issue an injunction barring the State from renegotiating the lease until it determines that the United States has complied with its terms, notwithstanding the Plaintiffs' request for such relief.)

60

Lastly, it is noted that the United States stated in its filing that "if relief were entered that impacted the interests of the United States, the Government would at that time consider what action to take, including whether to file a motion to intervene as a party for the purpose of removing the case to United States District Court pursuant to 28 U.S.C. § 1442(a)."  And, in denying the State's motion to add the United States as a party without prejudice, the circuit court stated that the United States would have an "automatic right to intervene" if it chose to.  Nevertheless, the United States has not filed a motion to intervene in the present case, nor even requested permission to participate as amicus curiae--which would avoid any waiver of sovereign immunity.  See Sch. Dist. of Pontiac v. Sec'y of U.S. Dept. of Educ., 584 F.3d 253, 266 (6th Cir. 2009).  In determining whether the circuit court erred in permitting the case to proceed in the United States' absence, it is appropriate for this court to consider that, "even if the [United] States ha[d] a particular interest in this dispute, [it] had the opportunity to intervene to protect that interest but declined to participate."  Id.  "[I]t would turn Rule 19 analysis on its head to argue that the [United] States' interests are now impaired because [it] declined to participate in this much-publicized case."  Id.

Based on the foregoing, we affirm the circuit court's denial of the State's motions to join the United States as a necessary party and to dismiss the case for failure to join an indispensable party.

### 2. The Case Presents a Justiciable Controversy

### a. The Alleged Breach of Trust Is an Actual Controversy for Purposes of HRS § 632-1

The State argues that, because the Plaintiffs have not alleged that the United States actually violated the terms of the lease, there is no controversy between the parties of sufficient immediacy and reality to warrant declaratory judgment.[41]  The State relies on Asato v. Procurement Policy

---

[41]     In response, the Plaintiffs argue that the court's jurisdiction over their claims is not dependent on HRS § 632-1.  This court has recognized that the beneficiaries of the article XII, section 4 ceded land trust possess a constitutional cause of action against state officials to prospectively enjoin violations of their trust duties.  Pele Def. Fund v. Paty, 73 Haw. 578, 601-06, 837 P.2d 1247, 1261-64 (1992).  Thus, the Plaintiffs' request for an order requiring the State to prospectively fulfill its trust duties and enjoining future trust violations is not dependent on HRS § 632-1.

        We have clarified, however, that the implied constitutional right of action does not permit a court to "turn back the clock" to grant retrospective relief for "actions already taken by the State."  Id. at 601, 837 P.2d at 1262.  And we have indicated that suits seeking retrospective declaratory relief based on an alleged constitutional violation that has already occurred are governed by HRS § 632-1.  See Nelson v. Hawaiian Homes Comm'n, 127 Hawai'i 185, 205, 277 P.3d 279, 299 (2012) (applying HRS § 632-1 in a suit seeking a declaration that the State had violated its duty to afford "sufficient sums" to the Office of Hawaiian Affairs under article XII, section 1 of the Hawai'i Constitution); Kaho'ohanohano v. State, 114 Hawai'i 302, 332, 162 P.3d 696, 726 (2007) (applying HRS § 632-1 in a suit seeking a declaration that the State had violated the article XVI, section 2 prohibition on the impairment of accrued retirement system benefits).  Therefore, to the extent the Plaintiffs are seeking a declaration that the State has already violated its trust duties, this relief is dependent on satisfying the requirements of HRS § 632-1.

Board, 132 Hawai'i 333, 322 P.3d 228 (2014) and Kau v. City and County of Hawai'i, 104 Hawai'i 468, 92 P.3d 477 (2004), which it contends demonstrate that the Plaintiffs' claim is too speculative to qualify for declaratory relief under HRS § 632-1.

Recently, this court considered the requirements that must be met to demonstrate a controversy that is subject to a request for declaratory relief under HRS § 632-1(b). We held that

> a party has standing to seek declaratory relief in a civil case brought pursuant to HRS § 632-1 (1) where antagonistic claims exist between the parties (a) that indicate imminent and inevitable litigation, or (b) where the party seeking declaratory relief has a concrete interest in a legal relation, status, right, or privilege that is challenged or denied by the other party, who has or asserts a concrete interest in the same legal relation, status, right, or privilege; and (2) a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding.

Tax Found. of Hawai'i v. State, 144 Hawai'i 175, 202, 439 P.3d 127, 154 (2019).[42] It is clear that the Plaintiffs' assertion that the State breached the trust duty that it owes to them as beneficiaries meets these requirements, and additionally, the cases relied upon by the State are inapposite.

---

[42] Hawai'i state courts are not subject to a constitutional "case or controversy" jurisdictional limitation. See Haw. Const. art. VI, § 1 ("The several courts shall have original and appellate jurisdiction as provided by law . . . ."); Trs. of Office of Hawaiian Affairs v. Yamasaki, 69 Haw. 154, 170 n.17, 737 P.2d 446, 456 n.17 (1987); Tax Found., 144 Hawai'i at 190, 439 P.3d at 142.

In Asato, the plaintiff brought suit seeking to invalidate an administrative rule relating to the State's contracting policies and to void every contract that the State had entered into under the regulation. 132 Hawai'i at 337, 322 P.3d at 232. Notably, the claim in Asato was brought under HRS § 91-7(a), which allows "any interested person" to challenge an agency rule.[43] Asato did not concern HRS § 632-1, and it thus does not provide guidance herein. See Tax Found., 144 Hawai'i at 194–95, 439 P.3d at 146–47 (discussing the requirements of HRS § 91-7 and HRS § 632-1 separately).

Further, even if Asato had been brought under HRS § 632-1, its holding is not helpful to the State. Although the Asato court invalidated the challenged administrative rule, it declined to declare that the contracts entered into under the regulation were void, noting that no connection had been alleged between the plaintiff and any of the individual contracts. Id. at 355, 322 P.3d at 250. The court determined that, without

---

[43]    HRS § 91-7(a) provides as follows:

(a) Any interested person may obtain a judicial declaration as to the validity of an agency rule as provided in subsection (b) by bringing an action against the agency in the circuit court or, if applicable, the environmental court, of the county in which the petitioner resides or has its principal place of business. The action may be maintained whether or not the petitioner has first requested the agency to pass upon the validity of the rule in question.

knowing the plaintiff's relation to each contract, it could not identify any controversy that could be ended by a declaration that the contracts were void. Id. ("Absent any rendition of the circumstances surrounding each contract, it cannot be determined from the allegations whether there is a substantial controversy as to a particular contract that is of sufficient immediacy and reality to warrant a declaratory judgment." (internal quotations omitted)).

By contrast, the Plaintiffs here are connected to the PTA and the manner in which the State manages it because the PTA is held in trust by the State for the Plaintiffs' benefit. This is to say that the trust duty that the Plaintiffs allege the State has breached is a duty the State owes to the Plaintiffs, and a declaration regarding whether the State has breached that duty would terminate the controversy by clarifying the contours of that duty.

The State also relies on Kau, in which this court considered a Honolulu ordinance that permitted the lessees of condominium units to purchase fee simple interests through a condemnation proceeding. 104 Hawaiʻi at 472, 92 P.3d at 481. The case began when the fee simple owners of a condominium project brought an action seeking a declaration that the subdivision of the property into individual units would end upon the expiration of the developer's master lease in 2014, and thus

the sublessees of the individual units would not acquire fee simple interests in their individual units if they were condemned under the ordinance. Id. The Kau court held that, because the fee simple owners were "requesting a judgment based on the expiration of the Master Lease, an event that [would] occur at some time in the future; there [wa]s no actual controversy in existence at th[at] time." Id. at 475, 92 P.3d at 484. Specifically, the court noted that the declaration would require speculation as to the conditions that would exist when the master lease expired. Id. During the interim, the court reasoned, the city could condemn the fee owner's interest or the fee owners could make the appropriate filings to make the subdivision permanent, thereby avoiding the situation that the fee simple owners wished the court to rule on. Id.

Unlike in Kau, the Plaintiffs' breach of trust claim based on a failure to reasonably monitor the United States' compliance with the lease does not require the court to speculate about future conditions--nor even the present likelihood that the United States is currently in breach of the lease.[44] Rather, the Plaintiffs alleged that the State has

_____

[44] The circuit court additionally determined that the State would further breach [its] trust duties if [it] were to execute an extension, renewal, or any other change to the State General Lease No. S-3849, or enter into a new lease of the

(continued . . .)

already breached its duty as a trustee by failing to monitor compliance with the provisions of the lease, irrespective of whether the United States actually complied with the lease terms.  This case thus presents the type of controversy that is necessary to qualify for relief under HRS § 632-1(b).

## b. The Alleged Breach of Trust Does Not Present a Political Question

Under the political question doctrine, courts refrain from deciding certain matters that are committed to the discretion of the other branches of government, reasoning that government action in these areas is properly addressed through democratic processes.  See Trs. of Office of Hawaiian Affairs v. Yamasaki, 69 Haw. 154, 171, 737 P.2d 446, 456 (1987).  This court has adopted the test for identifying a political question articulated by the United States Supreme Court in Baker v. Carr, 369 U.S. 186, 217 (1962).  Under the Carr formulation, a political question may be found when "on the surface of [a] case" there is 1) "a textually demonstrable constitutional

---

(. . . continued)

> PTA, without first determining (in writing) that the terms
> of the existing lease have been satisfactorily fulfilled,
> particularly with respect to any lease provision that has
> an impact upon the condition of the [PTA] leased lands.

As discussed in more detail infra, Part V.B.4, any breach of trust claim regarding the State's renewal of the lease is speculative and not ripe for review, and thus this aspect of the Plaintiffs' claim does not present a controversy susceptible to declaratory relief under HRS § 632-1.

commitment of the issue to a coordinate political department;" 2) "a lack of judicially discoverable and manageable standards for resolving it;" 3) "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;" 4) "an unusual need for unquestioning adherence to a political decision already made;" or 5) "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." Yamasaki, 69 Haw. at 169-70, 737 P.2d at 455 (quoting Carr, 369 U.S. at 217).

The State contends that Plaintiffs' claim that it violated its constitutional public trust duties is a nonjusticiable political question under Yamasaki and Nelson v. Hawaiian Homes Commission. In Yamasaki, the Trustees of the Office of Hawaiian Affairs brought suit seeking 20% of the proceeds derived by the State as damages from an illegal sand mining operation taking place on ceded lands. 69 Haw. at 165-67, 737 P.2d at 452-54. Although HRS § 10-13.5 provided that "[t]wenty per cent of all funds derived from the public land trust . . . shall be expended by the [O]ffice of Hawaiian Affairs," the court held that the case presented a political question because no judicially discoverable and manageable standards existed for determining whether the damages amounted to "funds derived from the public land trust." Id. at 174, 737 P.2d at 458. Resolving the case would require an initial policy

determination that was typically reserved for nonjudicial discretion, the court held. Id. at 174-75, 737 P.2d at 458. In Nelson, the court held that determining what constitutes "sufficient funds" for three of the four purposes set forth in article XII, section 1 of the Hawaiʻi Constitution[45] was a political question not suited for judicial resolution. 127 Hawaiʻi at 188, 277 P.3d at 282. The court held that, even were it to declare that the amount of funds currently dedicated to three of the four purposes was insufficient, there were no discoverable standards in the text or constitutional history of the provision for a court to affirmatively determine the amount that would be sufficient. Id. at 206, 277 P.3d at 300.

These cited cases are plainly distinguishable. Unlike in Yamasaki and Nelson, this court's precedents interpreting the State's constitutional trust obligations and the widely developed common law of trusts provide many judicially

---

[45] Article XII, section 1 of the Hawaiʻi Constitution provides in relevant part as follows:

> The legislature shall make sufficient sums available for the following purposes: (1) development of home, agriculture, farm and ranch lots; (2) home, agriculture, aquaculture, farm and ranch loans; (3) rehabilitation projects to include, but not limited to, educational, economic, political, social and cultural processes by which the general welfare and conditions of native Hawaiians are thereby improved; (4) the administration and operating budget of the department of Hawaiian home lands; in furtherance of (1), (2), (3) and (4) herein, by appropriating the same in the manner provided by law.

discoverable and manageable standards for determining whether the State breached its trust duties. "It is well settled that the determination of whether or not a particular proposed action, by the trustee of a charitable trust, would constitute a breach of that trust, is a matter to be determined by the courts, as a part of their inherent jurisdiction." Kapiolani Park Pres. Soc. v. City & Cty. of Honolulu, 69 Haw. 569, 571, 751 P.2d 1022, 1024 (1988) (citing 15 Am.Jur.2d Charities § 135 (1976); 14 C.J.S. Charities § 49 (1939)).

The State points to the Ninth Circuit decision in Price v. Hawaii, in which the court held that as a matter of federal law, section 5(f) of the Admission Act[46] did not incorporate "all provisions of the common law of trusts" because to do so "would manacle the State as it attempted to deal with the vast quantity of land conveyed to it." 921 F.2d 950, 954-56 (9th Cir. 1990). While this court has approvingly quoted this passage when examining the State's obligations when administering a different, statutorily created trust, see

---

[46] "Article XII, § 4 was added to the Hawaii Constitution to expressly recognize the trust purposes and trust beneficiaries of the § 5(f) trust, clarifying that the State's trust obligations extend beyond the Hawaiian Homes Land Trust." Pele Def. Fund, 73 Haw. at 603, 837 P.2d at 1263 (citing Stand. Comm. Rep. No. 59 in I Proceedings of the Constitutional Convention of Hawai'i of 1978, 643-44 (1980)). "In article XVI, [section] 7, referred to by article XII, [section] 4, the State affirmatively assumes the [section] 5(f) trust responsibilities." Id. at 586 n.2, 837 P.2d at 1254 n.2.

70

Awakuni v. Awana, 115 Hawai'i 126, 133, 165 P.3d 1027, 1034 (2007), this does not establish that the common law of trusts is wholly inapplicable. This is to say that a ruling that not all provisions of the common law apply does not equate to a ruling that none of the provisions of the common law apply. Indeed, the same year that the Ninth Circuit decided Price v. Hawaii, it relied in part on the common law of trusts when it held in a related case that the same plaintiff stated a claim against the Office of Hawaiian Affairs based on an alleged breach of its section 5(f) trust duties. See Price v. Akaka, 928 F.2d 824, 826–27 (9th Cir. 1990) ("In addition, allowing Price to enforce § 5(f) is consistent with the common law of trusts, in which one whose status as a beneficiary depends upon the discretion of the trustee nevertheless may sue to compel the trustee to abide by the terms of the trust." (citing Restatement (Second) of Trusts §§ 214(1) cmt. a, 391)).

Further, this court may draw upon its own case law interpreting the State's constitutional trust obligations for administrable standards, including instances in which we have explicitly stated that beneficiaries of the ceded land trust may bring actions to determine whether executive branch agencies have breached their constitutional trust duties. See, e.g., Pele Def. Fund, 73 Haw. 578, 605, 837 P.2d 1247, 1264 (1992) ("We find that the actions of state officials, acting in their

official capacities, should not be invulnerable to constitutional scrutiny.  Article XII, § 4 imposes a fiduciary duty on Hawaiʻi's officials to hold ceded lands in accordance with the § 5(f) trust provisions, and the citizens of the state must have a means to mandate compliance.").  The State's contention that this case presents a nonjusticiable political question is thus without merit.

### 3. The Circuit Court Did Not Err in Concluding the State Breached Its Trust Duties

#### a. The Circuit Court Correctly Determined that the State has a Trust Duty To Reasonably Monitor the Trust Property, Including the United States' Compliance with the Terms of the Lease that Protect the Trust Property

In its conclusions of law, the circuit court determined that the State's trust duties include using "reasonable efforts" to preserve trust property and to take a proactive role in the management and protection of the leased PTA land.  The court ruled that one aspect of this duty is an obligation "to use reasonable efforts to ensure that Said Lease provisions that affect or impact the condition of ceded lands and all living things thereon are being followed and discharged."  Further, the court concluded that the State has a duty to consider the cumulative effects of the United States' use of the land upon the condition of the land and upon "the indigenous plants, animals, and insects, as well as the invasion to Plaintiffs' cultural interests in the Subject Land."

Although the State blends its arguments regarding the nature of its legal trustee duties with those regarding the underlying justiciability of the case, the State appears to dispute these rulings and to argue that its trustee duties do not include an obligation to reasonably monitor the leased PTA land.

The State's duties with respect to the leased PTA land are derived in part from the properties' status as "ceded land"--which are lands that were held by the civil government or the monarchy of the Hawaiian Kingdom at the time of the 1893 overthrow of the Hawaiian monarchy. See Pele Def. Fund, 73 Haw. at 585, 837 P.2d at 1254. When the United States annexed Hawai'i by a joint resolution of Congress in 1898, real property that had been classified as government lands or crown lands was ceded to the federal government. Id. Recognizing their special character, the Joint Resolution of Annexation exempted these lands from the general laws of the United States that governed federal land. State ex rel. Kobayashi v. Zimring, 58 Haw. 106, 124, 566 P.2d 725, 736 (1977) (citing Joint Resolution of July 7, 1898, 30 Stat. 750). Instead, the resolution specified that these lands should be held in a "special trust" for the benefit of the people of Hawai'i. Id. When Hawai'i was admitted into the Union as a state in 1959, these ceded lands were transferred back to the newly established state, subject to the trust provisions set forth in section 5(f) of the Admission Act. Pele

73

Def. Fund, 73 Haw. at 585, 837 P.2d at 1254 (citing Hawaii

Admission Act, Pub. L. No. 86-3, 73 Stat. 4, 6 (1959)).  Article

XII, section 4 was later added to the Hawai'i Constitution to

formally recognize these responsibilities, specifying that the

land "shall be held by the State as a public trust for native

Hawaiians and the general public."[47]  Id. at 586, 837 P.2d at

1254 (quoting Haw. Const. art. XII, § 4).  At that same time,

the framers and the people of Hawai'i adopted article XI, section

1, which created a public trust consisting of "all public

natural resources" to be administered by the State for the

benefit of the people.[48]  Haw. Const. art. XI, § 1.

---

[47]    Article XII, section 4 of the Hawai'i Constitution provides in
full as follows:

> The lands granted to the State of Hawaii by Section 5(b) of
> the Admission Act and pursuant to Article XVI, Section 7,
> of the State Constitution, excluding therefrom lands
> defined as "available lands" by Section 203 of the Hawaiian
> Homes Commission Act, 1920, as amended, shall be held by
> the State as a public trust for native Hawaiians and the
> general public.

[48]    Article XI, section 1 of the Hawai'i Constitution provides in full
as follows:

> For the benefit of present and future generations, the
> State and its political subdivisions shall conserve and
> protect Hawaii's natural beauty and all natural resources,
> including land, water, air, minerals and energy sources,
> and shall promote the development and utilization of these
> resources in a manner consistent with their conservation
> and in furtherance of the self-sufficiency of the State.
>
> All public natural resources are held in trust by the State
> for the benefit of the people.

As the State concedes, our case law and the common law of trusts make the State "subject to certain general trust duties, such as a general duty to preserve trust property." See, e.g., Zimring, 58 Haw. at 121, 566 P.2d at 735 ("Under public trust principles, the State as trustee has the duty to protect and maintain the trust property and regulate its use."); Kaho'ohanohano v. State, 114 Hawai'i 302, 325, 162 P.3d 696, 719 (2007) ("[It] is always the duty of a trustee to protect the trust property . . . ." (quoting Brenizer v. Supreme Council, Royal Arcanum, 53 S.E. 835, 838 (N.C. 1906))); In re Estate of Dwight, 67 Haw. 139, 146, 681 P.2d 563, 568 (1984) ("A trustee is under a duty to use the care and skill of a [person] of ordinary prudence to preserve the trust property." (citing Bishop v. Pittman, 33 Haw. 647, 654 (Haw. Terr. 1935)); Restatement (Second) of Trusts § 176 ("The trustee is under a duty to the beneficiary to use reasonable care and skill to preserve the trust property.").[49]  As trustee, the State must

---

[49]    The State's duty of care is especially heightened in the context of ceded land held in trust for the benefit of native Hawaiians and the general public under article XII, section 4.  This court has approvingly quoted the following in considering the ceded land trust:

> The native Hawaiian people continue to be a unique and distinct people with their own language, social system, ancestral and national lands, customs, practices and institutions.  The health and well-being of the native Hawaiian people is intrinsically tied to their deep feelings and attachment to the land.  'Aina, or land, is of crucial importance to the native Hawaiian people--to their

(continued . . .)

take an active role in preserving trust property and may not passively allow it to fall into ruin.  United States v. White Mt. Apache Tribe, 537 U.S. 465, 475 (2003) ("[E]lementary trust law, after all, confirms the commonsense assumption that a fiduciary actually administering trust property may not allow it to fall into ruin on [the fiduciary's] watch.").  It is self-evident that an obligation to reasonably monitor trust property to ensure it is not harmed is a necessary component of this general duty, as is a duty to investigate upon being made aware of evidence of possible damage.  This obligation inherently includes a duty to make reasonable efforts to monitor third-parties' compliance with the terms of agreements designed to protect trust property.

---

(. . . continued)

> culture, their religion, their economic self-sufficiency and their sense of personal and community well-being.  'Aina is a living and vital part of the native Hawaiian cosmology, and is irreplaceable.  The natural elements— land, air, water, ocean—are interconnected and interdependent.  To native Hawaiians, land is not a commodity; it is the foundation of their cultural and spiritual identity as Hawaiians.  The 'aina is part of their 'ohana, and they care for it as they do for other members of their families.  For them, the land and the natural environment is alive, respected, treasured, praised, and even worshiped.

Office of Hawaiian Affairs v. Hous. & Cmty. Dev. Corp. of Hawai'i, 121 Hawai'i 324, 333, 219 P.3d 1111, 1120 (2009) (alterations omitted) (quoting Office of Hawaiian Affairs v. Hous. & Cmty. Dev. Corp. of Hawai'i, 117 Hawai'i 174, 214, 177 P.3d 884, 924 (2008)).

This court held as much in Kelly v. 1250 Oceanside Partners, in which it considered the article XI, section 1 public trust duties of the Hawai'i Department of Health (DOH) with respect to a private development abutting coastal waters that the State had classified as "AA," meaning the waters were legally required to be kept as nearly as possible in their natural, pristine condition. 111 Hawai'i 205, 227-29, 140 P.3d 985, 1007-09 (2006). Although DOH had issued a permit to the developer that included provisions requiring the developer to abide by State regulations prohibiting the pollution of AA waters, this court held that including the provisions in the permit was not the end of DOH's duties as trustee. Id. Under public trust principles, we held, DOH was required to "not only issue permits after prescribed measures appear to be in compliance with state regulation, but also to ensure that the prescribed measures are actually being implemented after a thorough assessment of the possible adverse impacts the development would have on the State's natural resources." Id. at 231, 140 P.3d at 1011 (emphasis added). We thus effectively held that the State had a continuing public trust duty to reasonably monitor the developer to ensure it was complying with the permit. See id.

The present case presents close parallels to Oceanside Partners. As in Oceanside Partners, the State entered into an

agreement to allow a third party to use land for a particular purpose provided the third party complied with certain conditions intended to protect trust property. And as in Oceanside Partners, the State has a continuing trust duty to make reasonable efforts to ensure that the third party actually complies with those conditions. Thus, the State has a constitutional trust obligation to reasonably monitor the United States' compliance with the lease.

The State's attempts to distinguish Oceanside Partners are unavailing. As a threshold matter, the State is incorrect that no statute exists setting forth the State's obligations with respect to ensuring the United States' compliance with the lease; HRS § 171-7(5) provides that, "[e]xcept as provided by law the board of land and natural resources through the chairperson shall: . . . [e]nforce contracts respecting sales, leases, licenses, permits, or other disposition of public lands[.]" Moreover, this court has made clear that while overlap may occur, the State's constitutional public trust obligations exist independent of any statutory mandate and must be fulfilled regardless of whether they coincide with any other legal duty. Kauai Springs, Inc. v. Planning Comm'n of Kaua'i, 133 Hawai'i 141, 172, 324 P.3d 951, 982 (2014) ("As the public trust arises out of a constitutional mandate, the duty and authority of the state and its subdivisions to weigh competing

public and private uses on a case-by-case basis is independent of statutory duties and authorities created by the legislature."); see also In re TMT, 143 Hawai'i 379, 416, 431 P.3d 752, 789 (2018) (Pollack, J., concurring) ("Thus, although some congruence exists, BLNR's and the University of Hawai'i at Hilo's public trust obligations are distinct from their obligations under [Hawai'i Administrative Rules] § 13-5-30(c).").

Additionally, the fact that Paragraph 9 of the lease only requires the United States to "make every reasonable effort to . . . remove or deactivate all live or blank ammunition upon completion of a training exercise or prior to entry by the said public, whichever is sooner" does not render the State powerless to respond to a breach of this provision as the State contends.  It is well settled that an agreement by one party to use "reasonable" or "best efforts" generally creates an enforceable obligation as a matter of contract law. See, e.g., Soroof Trading Dev. Co. v. GE Fuel Cell Sys., LLC, 842 F.Supp.2d 502, 511 (S.D.N.Y. 2012) ("New York courts use the term 'reasonable efforts' interchangeably with 'best efforts' . . . [and] a 'best efforts' clause imposes an obligation to act with good faith in light of one's own capabilities." (quoting Monex Fin. Serv. Ltd. v. Nova Info.

Sys., Inc., 657 F.Supp.2d 447, 454 (S.D.N.Y. 2009))); Allview Acres, Inc. v. Howard Inv. Corp., 182 A.2d 793, 796 (Md. 1962) ("What will constitute reasonable efforts under a contract expressly or impliedly calling for them is largely a question of fact in each particular case and entails a showing by the party required to make them of 'activity reasonably calculated to obtain the approval by action or expenditure not disproportionate in the circumstances.'" (quoting Stabile v. McCarthy, 145 N.E.2d 821, 824 (Mass. 1957))). And, while the lease may not contain a provision expressly allowing the State to terminate the lease, it does contain a dispute resolution mechanism in Paragraph 30. This mechanism appears to specifically contemplate the possibility of judicial enforcement, setting forth the conditions under which "a court of competent jurisdiction" may set aside the administrative factual findings and specifying that administrative decisions on questions of law shall not be final.

Moreover, the State errs by presuming that initiating a formal action to enforce the lease is the only possible response it could undertake to preserve and protect the PTA land if it discovers the United States is in noncompliance with the relevant provisions of the lease. A range of other options may be available that could satisfy its public trust obligations under the circumstances, including seeking to

80

obtain the United States' voluntary cooperation.  As the Plaintiffs argued during the summary judgment hearing, how the State responds if reasonable monitoring and investigation lead to a discovery that the United States is not in compliance with the lease could potentially be a separate breach of the State's public trust duties, and this court need not speculate about what hypothetical future actions are reasonable in order to resolve this case.

The State is therefore wrong to suggest that reasonably monitoring the United States' compliance with the lease is a futile or pointless endeavor, and Oceanside Partners' holding that the State has an ongoing trust obligation to ensure third-party compliance with provisions designed to protect trust property is dispositive as to the existence of this obligation.

### b. The Circuit Court Did Not Err in Determining that the State Did Not Reasonably Monitor the Trust Property, Including the United States' Compliance with the Lease Terms that Protect Trust Property

The State appears to argue next that, even if it does have a trust duty to reasonably monitor the United States' compliance with the lease, the circuit court erred in finding that it breached that duty by failing to conduct regular inspections of the PTA and by failing to investigate when it was made aware of evidence that the United States may have violated

provisions of the lease designed to protect the leased PTA land. "Typically, whether a fiduciary acted prudently--or in other words, as a reasonably prudent fiduciary--is a question of fact." Harley v. Minn. Mining & Mfg. Co., 42 F.Supp.2d 898, 907 (D. Minn. 1999); see also Knodle v. Waikiki Gateway Hotel, Inc., 69 Haw. 376, 385, 742 P.2d 377, 383 (1987) ("Whether there was a breach of duty or not, i.e. whether there was a failure on the defendant's part to exercise reasonable care, is a question for the trier of fact."). Accordingly, the circuit court's determination that the State did not reasonably monitor the United States' compliance with the lease terms must be upheld if it is not clearly erroneous.

The circuit court specifically found that the State had breached its trust duties by failing to, inter alia:

> (a) conduct regular reasonable (in terms of frequency and scope), periodic monitoring and inspection of the condition of subject public trust lands . . . ;
>
> (b) ensure that the terms of the lease that impact the condition of the leased lands or preserving Plaintiffs' cultural interests are being followed;
>
> (c) take prompt and appropriate follow up steps with military or other federal government officials when [the State] obtain[s] or [is] made aware of evidence or information that the lease may have been violated with respect to protecting the condition of the [PTA] leased lands[.[50]]

---

[50] The circuit court additionally found that the State had breached its trust duties by failing to consistently make reasonably detailed and complete records of its actions to ensure compliance with the lease and by failing to initiate or assist with the appropriation of necessary funding to

(continued . . .)

82

(Line breaks added.)  In making this determination, the court relied on the fact that "[o]nly three [inspection] reports of any significance, for 1984, 1994, and 2014, were introduced into evidence."  Of these, "[t]he 1984 and 1994 reports were grossly inadequate and, in the case of the 1994 report, virtually nonexistent because of its lack of information pertaining to the 1994 inspection."  The court stated that it was not considering "other studies or site visits in connection with other business regarding the [PTA], such as environmental impact statements, [because] the court did not view these events as being undertaken as part of [the State's] effort to discharge" its trust duties.

The State argues that the circuit court's determination was clearly erroneous because it explicitly disregarded the State's reliance on cooperative agreements, environmental reports, and archeological surveys to supervise

_____

(. . . continued)

undertake cleanup of the PTA.  And the court held that the State would breach its trust duties if it were to extend or renew the lease "without first determining (in writing) that the terms of the existing lease have been satisfactorily fulfilled, particularly with respect to any lease provision that has an impact upon the condition of the" PTA.  The State does not appear to challenge these conclusions on appeal, raising in their point of error regarding the breach only that "[t]he circuit court erred in finding that the State breached its trust duties by failing to perform adequate inspections of the Subject Land."  Nevertheless, as discussed below, the circuit court's order regarding the securing of funding for cleanup was not suited to remedy the breach alleged by the Plaintiffs, and any holding regarding a future breach of the State's trust duties is speculative.

the United States' use of the PTA.[51]  Under the circumstances,

the State contends, it was reasonable for the State to delegate

its duties[52] and rely on its review of ancillary documents to

monitor the PTA.

---

[51]    These documents included a copy of the United States training regulations and procedures from 1970, an environmental assessment for a training exercise in 1982, a 1984 archeological survey report, a 2002 Integrated Natural Resources Management Plan, a 2004 environmental impact statement, and a 2004-2010 "Programmatic Agreement" to provide additional protection to cultural sites.

[52]    The State cites Restatement (Second) of Trusts § 171 for the proposition that a trustee has authority to cooperate, consult, and delegate to others tasks relating to trust administration when it is reasonable to do so.  However, this is not an accurate description of Restatement (Second) of Trusts § 171, which is entitled "Duty Not to Delegate."  (Emphasis added.) Under the approach taken by the First and Second Restatement, "[t]he trustee is under a duty to the beneficiary not to delegate to others the doing of acts which the trustee can reasonably be required personally to perform." Id.; Restatement (First) of Trusts § 171.  However, "[t]he position of The American Law Institute was fundamentally changed in 1992," and Restatement (Third) of Trusts § 80, "Duty with Respect to Delegation," provides as follows:

> (1) A trustee has a duty to perform the responsibilities of the trusteeship personally, except as a prudent person of comparable skill might delegate those responsibilities to others.
>
> (2) In deciding whether, to whom, and in what manner to delegate fiduciary authority in the administration of a trust, and thereafter in supervising or monitoring agents, the trustee has a duty to exercise fiduciary discretion and to act as a prudent person of comparable skill would act in similar circumstances.

Restatement (Third) of Trusts § 80 and Reporter's Notes on § 80.  Hawaiʻi courts have not explicitly adopted either the Restatement's original position or the new position set forth in the Third Restatement, though many older cases make clear that at least some of a trustee's duties are non-delegable. See Hartmann v. Bertelmann, 39 Haw. 619, 627 (Haw. Terr. 1952) ("[T]he primary responsibility of administering the trust is the trustee's, which he cannot delegate . . . ."); In re Banning's Estate, 9 Haw. 453, 463 (Haw. Rep. 1894) ("The duties and powers of trustees cannot be delegated.").

To the extent the State argues that it can delegate its public trust duty to reasonably monitor the PTA to protect and preserve trust property, this contention is squarely counter to our precedent indicating that the State may not delegate its constitutional duties to third-parties.  See Ka Pa'akai O Ka'Aina v. Land Use Comm'n, 94 Hawai'i 31, 50-51, 7 P.3d 1068, 1087-88 (2000) (holding that the Land Use Commission improperly delegated its article XII, section 7 "responsibility for the preservation and protection of native Hawaiian rights" by authorizing a land reclassification on the promise that the developer would later create a program to accommodate native practitioners, as the "balancing of the developer's interests with the needs of native Hawaiians should have been performed, in the first instance, by the" State agency).  The Ka Pa'akai court held that the Hawai'i Constitution places "an affirmative duty on the State and its agencies to preserve and protect traditional and customary native Hawaiian rights."  Id. at 45, 7 P.3d at 1082 (emphasis added).  At the core of this affirmative duty, as explained by the Ka Pa'akai court, is the responsibility of the State and its constituent agencies to act only after "independently considering the effect of their actions on Hawaiian traditions and practices."  Id. at 46, 7 P.3d at 1083.

An affirmative duty of the State to protect and preserve constitutional rights is by its very nature non-delegable.

Even if such a delegation were not inherently invalid under the Hawai'i Constitution and permitted under our common law of trusts, that delegation would itself have to be reasonable under the prudent person standard, and the State would maintain a trust duty to reasonably supervise the agent in its performance of the monitoring. See supra note 52. It is self-evident that, as a general matter, it is not reasonable for a trustee to delegate the supervision of a lessee's compliance with the terms of a lease of trust property to the lessee. Cf. Halderman v. Pennhurst State Sch. & Hosp., 526 F. Supp. 428, 433 (E.D. Pa. 1981) ("The Commonwealth defendants appear to take the position that they should be able to monitor their own compliance with the Court's Orders. This would be somewhat akin to requesting the fox to guard the henhouse."). This is especially true given the circuit court's findings that the State was aware of the United States' history of failing to prevent environmental damage and clean up the remnants of military exercises on other State-owned land that it leases, including Mākua and the Waikāne Valley.

Nevertheless, it is generally not considered a breach of duty for a fiduciary to rely in part on reports prepared by a person as to matters that the fiduciary reasonably believes to

be within that person's expertise.  Cf. HRS § 414D-155(b)(2) (Supp. 2018);[53] HRS § 414D-149(b)(2) (Supp. 2018).[54]  Democratic principles and the checks and balances of government may arguably serve to make a governmental entity like the United States more accountable than the average lessee, and some of the documents authored on behalf of the United States included observations by independent third parties.  If the State took appropriate action to verify the content, it may have reasonably concluded that the reports were reliable, and it could have validly considered them in the course of fulfilling its non-delegable trust duties.  The circuit court therefore appears to have erred in disregarding the State's review of these ancillary documents in assessing whether the State had fulfilled its trust duty to reasonably monitor the PTA solely on the basis that these other reports were not "undertaken as part of [the State's] effort to discharge" its trust duties.

But the State's efforts were clearly inadequate in any event.  The ancillary reports occurred very infrequently and in

---

[53]    HRS § 414D-155(b)(2) provides that, in the course of discharging the officer's duties, an officer of a nonprofit corporation may "rely on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by . . . [l]egal counsel, public accountants, or other persons as to matters the officer reasonably believes are within the person's professional or expert competence."

[54]    HRS § 414D-149(b)(2) provides the same right to rely on information from professionals regarding matters within their expertise to directors of a non-profit corporation.

some cases cited evidence of damage and suggested that the
United States may not have been in compliance with the lease.
Indeed, the circuit court made specific findings regarding
adverse environmental information included in two of the United
States' reports.  It noted that a 2010 archaeological and
cultural monitoring report stated,

> The Military needs to implement some kind of cleanup
> process as part of their training in PTA.  Remnants of
> military trash is everywhere.
>
> . . . .
>
> Another major concern is the military debris that is left
> behind after training including [UXO] that is carelessly
> discarded.  There is a need to have some type of cleanup
> plan implemented in the military training process.

(Emphasis omitted.)  The court also found that a second
archaeological and cultural monitoring report made four years
later expressed many of the same concerns with specific regard
to the United States' obligations under the lease:

> Remnants of live fire training are present within the BAX,
> including stationary targets, junk cars, an old tank,
> crudely built rock shelters, and miscellaneous military
> rubbish.  Spent ammunition is scattered across the
> landscape.
>
> . . . .
>
> This lease . . . requires the land to be restored to its
> original state when returned.  This cannot occur if the
> land remains so littered with UXO that it is unsafe for
> anyone to go on the land.  If this is the case, the land
> will be rendered unusable forever--one eighth of our island
> will become unavailable for use by any of our future
> generations.  This is not acceptable nor could it be
> construed in any way to be in compliance with the Statehood
> compact.
>
> Therefore, in order for the Army to meet the lease
> termination deadline, we strongly recommend the Army begin
> now to seek funding to initiate a serious cleanup effort

> throughout the leased training areas bounding the impact
> areas: that major impact/UXO areas be subjected to thorough
> cleanup[.]

(Emphasis and some alterations in original.)[55]  There was no indication the State ever followed up on these reports.

The circuit court found that the State breached its trust duties: by failing to conduct regular monitoring and inspections that were reasonable in frequency and scope to examine the condition of the leased PTA land; by failing to ensure that the terms of the lease that impact the condition of the leased PTA land were being followed; and by failing to take prompt and appropriate follow-up steps when it was made aware of evidence that the lease may have been violated with respect to protecting the condition of the leased PTA land. In light of the foregoing, the circuit court did not err in these findings.

**4. The Injunctive Relief Ordered by the Circuit Court Was Not Entirely Suited To Remedy the Demonstrated Breach**

The circuit court ordered the State to rectify its breach of its constitutional public trust duties by "promptly initiat[ing] and undertak[ing] affirmative activity to malama

---

[55]    Although the court did not make any specific findings regarding the other reports on which the State claims it relied, several of these also documented substantial environmental problems with the leased PTA land.  For example, the 2002 Integrated Natural Resources Management Plan noted in a section setting forth the "Adverse Effects" of the "Military Mission on Natural Resources" that 22.9% of the ground cover in the surveyed area consisted of litter and "[t]here was virtually no evidence of maintenance activity."

ʻaina the" PTA.  According to the court, this includes but is not limited to developing a written plan to care for the land.  The court stated that the plan must include the following:

- regular, periodic on-site monitoring and inspection;

- the making of inspection reports that at minimum include a set of specified information, recommendations for appropriate action, and a nonbinding estimated timeline for when such action should be undertaken;

- a protocol of appropriate action that will be undertaken if the State discovers an "actual, apparent, or probable breach of any provision" of the lease by the United States, [UXO] or debris deposited during training exercises, any other foreign or non-natural item or contaminate connected with the lease, or any other condition adversely affecting the PTA;

- a protocol or other assurance to bring any nonconforming condition found that is likely caused by the United States under the lease into pre-lease condition on a reasonable timetable;

- a set of steps the State will take to obtain or assist in securing adequate funding for a comprehensive cleanup of the PTA; and

- a procedure to provide reasonable transparency to the Plaintiffs and the general public with regard to the State's progress in fulfilling the court's order.

The court also ordered the State to initiate HRS Chapter 91 rulemaking to establish a contested case procedure, if not already in existence, through which the Plaintiffs or any member of the general public with standing could challenge the State's decisions in the course of discharging its trust duty to care

90

for the leased PTA lands.  Lastly, the court ordered that the State submit its plan to care for the land to the court for approval prior to executing it.

The form and scope of injunctions issued by Hawai'i courts are governed by HRCP Rule 65(d), which provides as follows:

> Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

(Emphases added).  We have stated that, when granting an injunction, a court should adopt relief and "mold[] its decree to satisfy the requirement[s] of th[e] particular case and thereby conserve the equities of all of the parties."  Fleming v. Napili Kai, Ltd., 50 Haw. 66, 70, 430 P.2d 316, 319 (1967); see also Moffat v. Speidel, 2 Haw. App. 334, 335, 631 P.2d 1205, 1206 (1981) (holding that a court's failure to "mold its decree and the relief granted to satisfy the requirements of the case" violates HRCP Rule 65(d)).  In interpreting the substantively identical federal rule, federal courts have consistently held that injunctions must "remedy only the specific harms shown by the plaintiffs."  Price v. City of Stockton, 390 F.3d 1105, 1117 (9th Cir. 2004) (internal quotes and citations omitted).  An

overbroad injunction is an abuse of discretion.  <u>Kohl v.
Legoullan</u>, 936 P.2d 514, 519 (Alaska 1997).

As discussed <u>supra</u>, the circuit court correctly
determined that the State breached its constitutional trust
duties by failing to reasonably monitor the PTA, including by
failing to inspect the land to ensure the United States'
compliance with the lease terms intended to protect and preserve
trust property.  Much of the circuit court's order was
appropriately tailored to address this breach.  By requiring the
State to develop and execute a plan to conduct regular, periodic
monitoring and inspection, the court's order ensured that the
State would fulfill its trust duty to inform itself of the
present condition of the leased PTA land and whether the United
States was in compliance with the relevant terms of the lease so
that it might take further action if needed to protect and
preserve trust property.[56]  By requiring these inspections to be

---

[56]    The circuit court's order included several specific details as to
how the inspections should be carried out, including that

> the monitoring should involve direct (in person) or
> indirect (via videographic or live remote viewing)
> observation of actual military training exercises
> (including live fire exercises of all types using live
> and/or explosive munitions, as well as the use of heavy
> vehicles or equipment above and upon the land) so that the
> monitors and/or inspectors can observe and appreciate the
> destructive effects, if any, of all such training and use
> of equipment[.]

While these measures may represent the quality of monitoring that the State
should aspire to, we hold that the circuit court's order should be

(continued . . .)

documented in detailed inspection reports, the order assures that the inspections are meaningful and allows trust beneficiaries to evaluate the State's response to what it discovers, enabling the bringing of a future action to enforce the State's trust duties if it fails to fulfill them.  And by requiring the State to establish a procedure to ensure reasonable transparency to the Plaintiffs and general public regarding the State's progress with complying with the court's order, the order ensures its own effectiveness through public oversight.

The State contends that because the circuit court's order does not specify how often the periodic inspections must take place, it is impermissibly vague.[57]  But it is not uncommon for courts to issue generally-stated orders requiring government agencies to submit plans to remedy constitutional violations and then evaluate the adequacy of the plans prior to their

---

(. . . continued)

interpreted to require monitoring to the fullest extent consistent with the State's right of reasonable entry under the lease and no more.

[57]  The State argues that this requirement ensures further litigation and indicates the relief does not "terminate the uncertainty or controversy giving rise to the proceeding" as required by HRS § 632-1.  As stated, however, the Plaintiffs have a constitutional cause of action for prospective injunctive relief that exists independently of HRS § 632-1.  See supra note 41.

implementation.[58]  And this court has prescribed substantially more intensive monitoring to ensure specific compliance with terms of a broadly phrased order.  See Konno v. Cty. of Hawaiʻi, 85 Hawaiʻi 61, 79, 937 P.2d 397, 415 (1997) ("We further instruct the circuit court to fashion injunctive relief requiring the landfill to be transferred from private operation to County operation as rapidly as possible but consistent with practical and public interest concerns.  The circuit court shall also monitor the transition and may impose sanctions for non-compliance."); see also Tugaeff v. Tugaeff, 42 Haw. 455, 459 (Haw. Terr. 1958) ("A court of equity, having once assumed jurisdiction of a case, will retain the case to afford complete relief.")  The State's objections are thus without merit.  Under the circumstances of this case, the court did not abuse its discretion in ordering these remedies.

Many other portions of the circuit court's order, however, appear designed to remedy breaches of the State's trust duties that the Plaintiffs did not allege, including some that have not and may not occur.  Foremost among these is the circuit

---

[58]  See, e.g., Sanchez v. McDaniel, 615 F.2d 1023, 1024 (5th Cir. 1980) ("The district court determined that the 1968 Kleberg County, Texas, apportionment plan violated the constitutional principle of one man, one vote.  It directed the appellees to submit a proposed reapportionment plan by November 13, 1979."); Bd. of Pub. Instruction of Duval Cty. v. Braxton, 326 F.2d 616, 619-21 (5th Cir. 1964) (affirming court order requiring school board "to submit to the Court for its consideration a detailed and comprehensive plan" for ending school segregation).

court's statement that its order to care for the land "includes, but is not necessarily limited to" the measures specifically described therein. Courts have generally held that injunctions cannot be "so vague that they have no reasonably specific meaning." E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1297 (9th Cir. 1992). "The aims of Rule 65(d) are to minimize the occasion for follow-on proceedings to the issuance of an injunction and to protect defendants from being held in contempt for failure to follow a directive that was a trap because of its ambiguity." United States v. Apex Oil Co., 579 F.3d 734, 739 (7th Cir. 2009). The circuit court's order did not give the State any notice of what other, unstated measures the State was required to comply with, and the order thus must be limited to those remedies it expressly described.

Additionally, a number of the remedies ordered by the circuit court were unconnected with the State's breach of its duty to monitor and inspect the leased PTA land. The court ordered the State to develop and potentially execute a protocol to obtain, or assist in securing, adequate funding for a comprehensive cleanup of the leased PTA land. And the circuit court ordered the State to initiate rulemaking to establish a contested case procedure through which the public could challenge the State's decisions in generally caring for the leased PTA land, if such a procedure did not already exist. Yet

95

the Plaintiffs in this case did not allege that the State had violated its trust duties by allowing or failing to rectify damage to the leased PTA land.  Nor did the Plaintiffs contend that the State was constitutionally required to allow the public a voice in its general decisions regarding its care for the leased PTA land.  Rather, the Plaintiffs argued only that the State breached its duty to inspect and monitor the leased PTA land.  The State may very well have a public trust obligation to rectify damage to the leased PTA land, and the public may have some right to be heard on decisions that implicate the State's trust obligations with respect to the leased PTA land.  But these are not the claims that were brought in this case, and the remedies ordered by the circuit court are thus not "tailored to eliminate only the specific harm alleged."[59]  Quiksilver, Inc. v. Kymsta Corp., 360 F. App'x 886, 889 (9th Cir. 2009) (quoting E. & J. Gallo, 967 F.2d at 1297).

The circuit court also ordered a range of injunctive relief concerning the State's duties upon discovering damage or noncompliance during its inspections.  The court required the State to set forth a binding plan of action that it would

_____

[59]    Because these remedies are not tailored to address the specific breaches identified by the circuit court, we need not address the State's contention that the circuit court's cleanup orders violated sovereign immunity or that the order to initiate rulemaking impinged on the legislatures exclusive authority.

96

undertake if it were to discover unexploded ordnance, debris, or any other foreign or non-natural item or contaminate connected with the lease, as well as a plan to bring any "nonconforming" condition likely caused by the United States into pre-lease condition.  And the circuit court ordered the State to set forth in a binding plan the actions that it would take upon specifically discovering a breach of the lease terms by the United States.  However, as stated, the Plaintiffs have not alleged any breach of trustee duties related to the State's allowance or failure to rectify actual damage, and the Plaintiffs have adamantly maintained throughout these proceedings that they are not alleging that the United States has actually breached the lease.  Rather, the Plaintiffs argued only that the State had a trust duty to "determine for itself whether the terms of the lease are being fulfilled."

As the Plaintiffs acknowledged during the hearing on their motion for summary judgment, how the State responds if it does later determine that the United States is not in compliance with the lease may result in a separate breach of the State's trust duties.  The same holds true for any other damage to the leased PTA land the State may discover during its monitoring and inspections.  Evaluating this hypothetical separate breach would require the circuit court to speculate about various questions that it cannot currently resolve, including whether the State's

monitoring will lead to the discovery of damage or noncompliance of lease terms by the United States, whether the United States will cure the damage or noncompliance on its own accord, and whether any further action by the State will be reasonable given the circumstances at that time. As this court has held, courts are not at liberty to grant relief based on "an event that [may] occur at some time in the future" because "there is no actual controversy in existence at this time." Kau v. City & Cty. of Honolulu, 104 Hawai'i 468, 472, 92 P.3d 477, 481 (2004). For the same reason, the circuit court's conclusion that the State would breach its trust duties if it were to renew the lease without first determining that the United States was in compliance with the existing lease was impermissibly speculative.

Thus, to the extent the circuit court made the provisions of its order that were not tailored to address the established breach binding upon the State, it strayed beyond its valid discretion in fashioning the injunction. Nevertheless, given the circumstances, including the length of time during which the State has failed to fulfill its trust duties and the State's claim to having near total discretion in its management of the public ceded land at issue in this case, it was not inappropriate for the circuit court to provide guidance as to how the State may fulfil its trust obligations in the future. See Beneficial Hawaii, Inc. v. Kida, 96 Hawai'i 289, 312, 30 P.3d

895, 918 (2001) ("Equity jurisprudence is not bound by strict rules of law, but can mold its decree 'to do justice[.]'" (quoting Bank of Hawaii v. Davis Radio Sales & Serv., Inc., 6 Haw. App. 469, 481, 727 P.2d 419, 427 (1986))).  We therefore hold that the portions of the court's order directing the State to undertake specific actions that were not tailored to remedy the established breach of the State's trust duties are nonbinding recommendations to be considered by the State going forward in its management of the leased PTA lands.

## VI. CONCLUSION

Based on the foregoing, the Plaintiffs' motions to dismiss the appeal respectively filed on July 27, 2018, and August 10, 2018, are denied.  The circuit court's January 14, 2015 Order Denying Defendants' Motion for Judgment on the Pleadings, or in the Alternative, for Summary Judgment, Filed October 7, 2014 is affirmed.  The circuit court's April 24, 2015 Order Denying Defendants' Motion to Add United States as a Party, or in the Alternative, for Dismissal Filed February 26, 2015 is also affirmed.  This court rules as follows regarding the circuit court's April 3, 2018 Findings of Fact, Conclusion of Law and Order and the circuit court's April 24, 2018 Final Judgment:

- Denial of the State's motion to add the United States as a party: **Affirmed**

• Denial of the State's motion to dismiss the case for failing to join an indispensable party: **Affirmed**

• Denial of the State's motion for summary judgment: **Affirmed**

• Finding that the State had breached its trust duties: **Affirmed**

• Order requiring the State to undertake any activities not expressly stated therein: **Vacated**

• Order requiring the State to submit a plan that must include the following:

   o Regular, periodic on-site monitoring and inspection of the leased PTA land and the United States' compliance with relevant lease provisions: **Affirmed**

   o The making of detailed reports for each such monitoring or inspection event: **Affirmed**

   o A protocol of appropriate action in the event the State discovers an actual or apparent breach of lease terms, any condition or situation adversely affecting the PTA, unexploded ordnance or debris, or any other foreign or non-natural item or contaminant: **Vacated with Instructions to Render as a Non-binding Recommendation**

   o A plan or other assurance that any nonconforming condition likely caused by the United States be reasonably brought to pre-lease condition: **Vacated with Instructions to Render as a Non-binding Recommendation**

   o A procedure to provide reasonable transparency to the Plaintiffs and the general public with respect to the requirements of the order: **Affirmed**

   o If not already in existence, the institution of a contested case procedure adopted pursuant to HRS Chapter 91 for Plaintiffs or other members of the public to contest the State's decisions in

managing the PTA: **Vacated with Instructions to Render as a Non-binding Recommendation**

o     The steps the State shall take to explore, evaluate, make application for, or secure adequate funding to conduct a comprehensive cleanup of the PTA: **Vacated with Instructions to Render as a Non-binding Recommendation**

•     Order requiring the State to execute the plan once it is approved by the circuit court: **Affirmed**

This case is accordingly remanded to the circuit court for

further proceedings consistent with this opinion.


Ewan C. Rayner                          /s/ Mark E. Recktenwald
(Daniel A. Morris, Clyde J.
Wadsworth, and William J.               /s/ Paula A. Nakayama
Wynhoff with him on the briefs)
for appellants                          /s/ Sabrina S. McKenna

David Kimo Frankel                      /s/ Richard W. Pollack
(Summer L.H. Sylva with him on
the briefs)                             /s/ Michael D. Wilson
for appellees

